THE AUSTIN COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1312–75.    Filed March 5, 1979.

*W. W. Davis, W. W. Davis, Jr.,* and *John A. Walker, Jr.,* for the petitioner.

*Richard J. Neubauer,* for the respondent.

WILES, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| FYE June 30th— | Deficiency |
| --- | --- |
| 1969 | $112,172.76 |
| 1970 | 231,963.31 |
| 1971 | 179,883.22 |

After concessions, the issues remaining for decision are:

(1) Whether petitioner is entitled to utilize an estimated useful life of 12 years for depreciable property acquired in fiscal years 1969, 1970, and 1971;

(2) Whether petitioner is entitled to a fiscal year 1969 deduction for loan financing expenses paid in that year;

(3) Whether petitioner is entitled to a deduction under section 162(a)[1] for Mexican taxes it paid in fiscal years 1969, 1970, and 1971 which were imposed upon Exportadora De Tabacos Mexicanos (hereinafter Mexicanos), its wholly owned Mexican subsidiary; and

(4) Whether petitioner is entitled to deductions under section 165(g) for worthless securities and under section 166(a)(2) for partially worthless loans because its stock and debt in Tabacos Columbianos, Ltd. (hereinafter Tabacol), a wholly owned Columbian subsidiary, became worthless in fiscal year 1971.

### GENERAL FINDINGS OF FACT

Some facts were stipulated and are found accordingly.

The Austin Co., Inc., a Tennessee corporation, maintained its

---

[1]Statutory references are to the Internal Revenue Code of 1954, as amended.

principal office in Greenville, Tenn., when it timely filed its Federal income tax returns for its tax years ended June 30, 1969, 1970, and 1971, and when it filed its petition in this case.

## FINDINGS OF FACT

### Issue 1. Useful Life of Depreciable Property

Petitioner, an accrual method taxpayer, is in the principal business of buying, processing, and selling tobacco. In processing the tobacco purchased from growers, petitioner uses stem and thrashing equipment to separate the tobacco leaf from its stem. Heavy volume operations and dirt and sand intermixed with the tobacco cause heavy wear and damage to the equipment. As a result, petitioner maintained a highly sophisticated maintenance program to keep the equipment in operation. Petitioner utilized the double declining balance method of depreciation.

Robert Austin, currently executive vice president, has been employed with petitioner since 1946. He indicated that petitioner has always used a 12-year life for its stem and thrashing equipment and that, based upon his 30 years' experience in the tobacco business, 10 to 12 years was an adequate useful life.

During petitioner's fiscal year ended June 30, 1969, it sold various used stem and thrashing equipment for a gain of $145,625. Robert Austin attributed the gain to a sophisticated maintenance program, a complete reconditioning of the old equipment prior to sale, market inflation, and accelerated depreciation.

The equipment was replaced by stem and thrashing equipment acquired during fiscal years 1969, 1970, and 1971 at a total cost of $378,057.18. Petitioner again utilized the double declining balance method of depreciation and a useful life of 12 years on all the equipment so acquired. Respondent increased the depreciable useful life of the stem and thrashing equipment acquired in fiscal years 1969, 1970, and 1971 from 12 to 15 years.

### Issue 2. Loan Expenses

In order to finance the buying, processing, and selling of its 1969–70 tobacco season, petitioner borrowed $9,500,000 and entered into a security agreement on November 21, 1968, with the Louisville Trust Co. (hereinafter Louisville Trust) for loans not to exceed $9,500,000. The security agreement remained effective

for future loans so long as the aggregate outstanding loans did not exceed $9,500,000. On November 19, 1969, and November 16, 1973, respectively, the security agreement was amended to increase the collateral for security and the maximum outstanding loans to $12,500,000. The terms and conditions of the November 21, 1968, loan required the following repayment schedule:

| Amount of payment | Date due |
|---|---|
| $5,000,000 | Mar. 15, 1969 |
| 500,000 | June 30, 1969 |
| 2,000,000 | Sept. 30, 1969 |
| 2,000,000 | Nov. 30, 1969 |

The entire $9,500,000 was repaid before October 30, 1969.

The November 21, 1968, security agreement granted Louisville Trust a security interest in certain assets of petitioner. In December 1968, Louisville Trust filed financing statements with the State to perfect its creditor interest in petitioner's assets against other creditors. In November 1973, Louisville Trust filed a continuation statement which continued the effectiveness of the December 1968 financing statement.

In its fiscal year ended June 30, 1969, petitioner paid $12,960 for nonrecurring recording and attorneys' fees in connection with the December 1968 filing of the financing statements. No other recording and attorneys' fees were necessary to file this financing statement. For several years following 1968, petitioner negotiated new loans with Louisville Trust, but each loan was for a new tobacco season and was separately negotiated. Petitioner had no assurance the bank would make the new loans necessary to finance each annual business cycle, or, if so, what the terms, conditions, or amounts of the loans would be. Subsequent loans were, however, successfully negotiated and each such loan through the 1974–75 tobacco season was entitled to the benefit of the December 1968 financing statements. No new financing statement was required to cover the new loans.

Petitioner deducted the $12,960 in recording and attorneys' fees in full in its fiscal year ended June 30, 1969, the year they were paid. Respondent disallowed the entire deduction on the ground that the loan expense had an indeterminable life.

### Issue 3. Payment of Foreign Subsidiary's Taxes

In fiscal years 1969, 1970, and 1971, petitioner shared various

employees with Mexicanos, its wholly owned Mexican subsidiary. Petitioner furnished supervisory and administrative personnel to Mexicanos on a full-time basis. Petitioner also furnished Mexicanos, on a part-time basis, technical personnel with expertise in cultivating, growing, grading, and processing tobacco. The technical personnel were utilized by petitioner in its United States tobacco season running from July through February and then loaned to Mexicanos for its counter tobacco season running from February through June. Petitioner also hired out its technical personnel to other unrelated tobacco processors in its off season.

Petitioner compensated both categories of its employees for the services they rendered to Mexicanos who, in turn, reimbursed petitioner for the exact amount of the compensation paid. Mexicanos incurred and paid a Mexican tax of $11,744.79, $10,940.71, and $13,572.41 in fiscal years 1969, 1970, and 1971, respectively, because of this compensation arrangement with petitioner.

Pursuant to this arrangement, petitioner reimbursed Mexicanos for the Mexican taxes it paid, and deducted the reimbursement when paid in fiscal years 1969, 1970, and 1971. Respondent disallowed the deduction in all such years on the ground that the Mexican taxes were not the expenses of petitioner within the meaning of section 162.

### Issue 4. Worthlessness of Stock and Debt in Tabacol

Tabacol, petitioner's wholly owned subsidiary, was incorporated in Columbia, South America, in 1961. It was in the business of buying, processing, and selling cigar tobacco in Columbia, South America.

As of June 30, 1970, Tabacol was solvent but had incurred operating losses for many years. The recurring losses were the result of petitioner's inexperience in cigar tobacco, unfamiliarity with potential cigar tobacco customers, and a lack of knowledge of the corruption involved in the Columbian tobacco business.

At a special meeting of its board of directors held on March 12, 1971, petitioner resolved to sell Tabacol's assets as quickly as possible and to proceed with a liquidation of the subsidiary. The liquidation and asset distribution to petitioner were to be completed prior to June 30, 1971. Pursuant to this resolution, petitioner attempted to sell Tabacol's assets to a competitor corpora-

tion but was unable to reach an agreement. Thereafter, petitioner negotiated with Sanford Tobacco Co. (hereinafter Sanford), an experienced operator in the cigar tobacco field. At the request of Sanford, petitioner obtained an independent appraisal of Tabacol's real and personal property on April 30, 1971. Following negotiations, Extacol, a second tier subsidiary of Sanford, executed a purchase agreement on June 14, 1971, for Tabacol's accounts receivable and personal property in the amount of $240,093.68. On June 28, 1971, Extacol executed an agreement to purchase Tabacol's land and building for $191,159.91. Tabacol was, therefore, to receive $431,253.59 in cash from Extacol on the sale.

As of June 30, 1971, Tabacol was in the process of winding up its affairs and disposing of its assets and liabilities. On that date, petitioner's investment, loans, and accounts receivable in Tabacol were as follows:

| | |
|---|---:|
| Investment in capital stock | $112,500.00 |
| Loans to Tabacol | 602,496.75 |
| Accounts receivable | 18,603.02 |
| | 733,599.77 |

The parties stipulated that petitioner's loan account with Tabacol is to be increased by $129,045 due to an adjustment by respondent for the fiscal year ended June 30, 1965. This adjustment, which was not recorded in either petitioner's or Tabacol's books and records as of June 30, 1971, was agreed to after petitioner filed its return for the fiscal year ended June 30, 1971.

As of June 30, 1971, Tabacol's pro-forma balance sheet, prepared by petitioner's accountant, reflecting the sale to Extacol (but prior to any distribution to petitioner) showed it to be insolvent, reflecting a deficit of $258,976.96:

### Assets

*Current assets:*

| | | |
|---|---:|---:|
| Cash | $5,000.00 | |
| Trade accounts receivable | 385,712.00 | |
| Other receivables | 31,000.00 | |
| Leaf tobacco inventory | 105,000.00 | |
| Materials and supplies | 10,000.00 | |
| Other assets: Dollar exchange rights | 60,000.00 | |
| Total | | $596,712.00 |
| Assets under June 14, 1971, contract with Extacol | | 425,007.81 |

*Noncurrent assets:*

| | | |
|---|---:|---:|
| Jeep | 2,000.00 | |
| Warehouse Plato | 2,500.00 | |
| Warehouse Coloso | 500.00 | |
| Land Ovejas | 7,500.00 | |
| Total | | [1]12,000.00 |
| Total assets | | 1,033,719.81 |

### LIABILITIES

*Bank debts:*

| | | |
|---|---:|---:|
| FNCB | 100,000.00 | |
| Chase Manhattan | 359,900.00 | |
| "Prenda" bonds | 33,000.00 | |
| Total | | 492,900.00 |

*Other:*

| | | |
|---|---:|---:|
| Claims | 5,697.00 | |
| Commissions | 58,000.00 | |
| Miscellaneous | 2,500.00 | |
| Total | | 66,197.00 |
| Total liabilities other than to Austin | | 559,097.00 |

*Due to Austin:*

| | | |
|---|---:|---:|
| Loans and advances | 621,099.77 | |
| Investment in stock | 112,500.00 | |
| Total | | 733,599.77 |
| Total liabilities | | 1,292,696.77 |
| Excess of liabilities over assets | | (258,976.96) |

---

[1]This figure appears as stipulated between the parties although the correct mathematical total would appear to be $12,500.

Clyde Austin, president of Tabacol and a certified public accountant with 7 years' experience in the tobacco industry, prepared the following balance sheet of Tabacol as of June 30, 1971, giving effect to the prior sale to Extacol and the payment of $425,007.81 to petitioner from the sale proceeds:

### ASSETS

*Current assets:*

| | | |
|---|---:|---:|
| Cash | $5,000 | |
| Trade accounts receivable | 385,712 | |
| Other receivables | 31,000 | |
| Leaf tobacco inventory | 105,000 | |
| Materials and supplies | 10,000 | |
| Other assets: Dollar exchange rights | 60,000 | |
| Total | | $596,712 |

*Noncurrent assets:*

| | | |
|---|---:|---:|
| Jeep | 2,000 | |
| Warehouse Plato | 2,500 | |
| Warehouse Coloso | 500 | |
| Land Ovejas | 7,500 | |
| Total | | [1]12,000 |
| Total assets | | 608,712 |

### LIABILITIES

*Bank debts:*

| | | |
|---|---:|---:|
| FNCB | 100,000 | |
| Chase Manhattan | 359,900 | |
| "Prenda" bonds | 33,000 | |
| Total | | 492,900 |

*Other:*

| | | |
|---|---:|---:|
| Claims | 5,697 | |
| Commissions | 58,000 | |
| Miscellaneous | 2,500 | |
| Total | | 66,197 |
| Total liabilities | | 559,097 |
| Net expected recovery | | 49,615 |

---

[1]This figure appears as stipulated between the parties although the correct mathematical total would appear to be $12,500.

Petitioner did not receive the estimated $49,615 but rather incurred additional expenses on behalf of Tabacol of $20,460. The $70,075 ($49,615 plus $20,460) was deducted as a worthless bad debt in petitioner's fiscal year ended June 30, 1972.

Petitioner, in its corporate income tax return for the fiscal year ended June 30, 1971, deducted an ordinary loss incurred on the liquidation of Tabacol of $258,977 computed as follows:

| | | |
|---|---:|---:|
| Balance of investment, loans, and accounts receivable as of June 30, 1971 | | $733,599.77 |
| Distribution from Tabacol from July 12, 1971, through Aug. 3, 1971 | $425,007.81 | |
| Estimated additional receivable from Tabacol as of Aug. 3, 1971 | 49,615.00 | (474,622.81) |
| Loss deducted | | 258,976.96 |

Petitioner claims in its petition that this loss should be in-

creased from $258,977 to $388,022 to reflect respondent's adjustment for fiscal year ended June 30, 1965, which increased petitioner's outstanding loans to Tabacol by $129,045. Petitioner contends this adjustment was unknown at the time the return for fiscal year ended June 30, 1971, was filed but that, once known, fiscal year 1971 is the proper year of deduction. Respondent disallowed petitioner's $258,977 deduction on the ground that the liquidation of Tabacol was not completed on June 30, 1971.

## OPINION

### Issue 1. Useful Life of Depreciable Property

We must determine the proper useful life of petitioner's stem and thrashing equipment acquired in fiscal years 1969, 1970, and 1971. Petitioner utilized a 12-year useful life. Respondent, relying on a sale of similar equipment at a gain of $145,625 in fiscal year 1969, determined the useful life of the equipment to be 15 years.

The useful life of an asset is that period for which the asset may reasonably be expected to be employed in the taxpayer's business. *Massey Motors, Inc. v. United States*, 364 U.S. 92, 107 (1960). In this regard, section 1.167(a)–1(b), Income Tax Regs., provides in pertinent part:

This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * *

Thus, the useful life of depreciable property is a question of fact; a matter of judgment and estimation that must be determined from the facts of the case. *Merchants Nat. Bank of Topeka v. Commissioner*, 554 F.2d 412 (10th Cir. 1977), affg. a Memorandum Opinion of this Court. When respondent adjusts the life chosen, however, the taxpayer has the burden to show that the determination is incorrect. *Merchants Nat. Bank of Topeka v. Commissioner, supra* at 415.

Petitioner relied upon many facts, including the testimony of Robert Austin, to establish error in respondent's determination of a 15-year useful life. Although Austin is an interested party,

we believe his testimony concerning the stem and thrashing equipment was credible and should be given substantial weight.[2] He had 30 years' experience with petitioner in the tobacco industry and is obviously familiar with the equipment in question. He indicated that petitioner's consistent practice was a 12-year useful life and that his experience indicated that 10 to 12 years was an adequate life. He indicated the heavy volume usage of the equipment and the dirt and sand mixed with the tobacco it processes cause heavy wear and damage.

Respondent challenges the life primarily upon the basis of the gain reflected on the sale of similar equipment in 1969. Austin testified that the gain was due to the facts that the equipment was reconditioned prior to sale, inflation, and accelerated depreciation. A careful review of the record compels us to conclude his testimony was accurate.

Accordingly, after due and careful consideration of the entire record, we find the stem and thrashing equipment acquired in fiscal years 1969, 1970, and 1971 had a useful life of 12 years at the time it was placed in service.

### Issue 2. Loan Expenses

Petitioner argues that the $12,960 in recording and attorneys' fees paid in fiscal year ended June 30, 1969, were capital expenditures incurred to borrow $9,500,000 for the 1968–69 tobacco season only. It contends, therefore, that the fees are to be amortized and deducted over the term of that loan.[3] Respondent agrees that the recording and attorneys' fees are capital expenditures, but he argues the expenses related to and benefited all the years petitioner continued its financial arrangement with Louisville Trust which he suggests was at least until December 31, 1974. As such, he contends the expenses are deductible only over the life of the financial arrangement with the bank. Since respondent argues the life of this financial arrangement was indeterminable when entered into, no annual amortization is allowable. We agree with respondent.

Section 263 provides in part that "no deduction shall be allowed for * * * any amount paid out for * * * permanent im-

---

[2] *Ward v. Commissioner*, T.C. Memo. 1978–216.

[3] Since $5,500,000 of the loan matured and was paid prior to June 30, 1969, and the $4 million balance was paid prior to June 30, 1970, it now contends 55/95ths of the loan expense is deductible in its fiscal year ended June 30, 1969, and the remaining 40/95ths in its fiscal year ended June 30, 1970.

provements or betterments made to increase the value of any property or estate." Loan expenses are capital expenditures. *Enoch v. Commissioner*, 57 T.C. 781, 794 (1972). As stated in *Lovejoy v. Commissioner*, 18 B.T.A. 1179, 1182 (1930): "In its essence such a disbursement is not unlike bond discount, prepaid rent, cost of acquiring or disposing of a leasehold or term contract and many other transactions. They should be spread over the *definite period* of the loans, lease, or contract." (Emphasis added.)

Although petitioner is correct in that the loan expenses must be amortized over the period of the loan and not the period of the financing statement or security agreement, we believe it fails to recognize that the expenses here involved benefited more than one of its loans with Louisville Trust. When more than one loan is benefited by the expense, we believe the terms of the loans must be aggregated to determine the proper amortization period. As the Supreme Court noted in *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 10 (1974): "The purpose of depreciation accounting is to allocate the expense of using an asset to the various periods which are benefited by that asset." But if, on the basis of facts or estimates known at the time the return is filed, the number of loans which will be covered by the financing statement cannot be estimated with reasonable certainty, it is impossible to accurately determine the period over which the recording and attorneys' fees should be amortized. *Philadelphia Quartz Co. v. Commissioner*, 13 B.T.A. 1146 (1928). In such a case, no annual amortization is allowable. Sec. 1.167(a)–3, Income Tax Regs.

Respondent has determined the term of petitioner's financial arrangement with Louisville Trust was indefinite and the burden is upon petitioner to prove that determination in error. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner must show more than uncertainty as to whether it would make future loans with Louisville Trust to satisfy its burden. See *Westinghouse Broadcasting Co. v. Commissioner*, 36 T.C. 912, 921 (1961), affd. 309 F.2d 279 (3d Cir. 1962), cert. denied 372 U.S. 935 (1963).

After a careful consideration of the entire record, we find that petitioner has failed to prove facts upon which we could form even a reasonable approximation of the useful life of the financial arrangement here in question. The nonrecurring loan expenses were incurred upon the filing of the financing statements

and related to all presently outstanding loans and all future loans made while the financing statement was in force. The laws of the States where the financing statements were filed provide that financing statements remain in effect for 5 years after filing and may be continued thereafter indefinitely by filing continuation statements every 5 years. See, e.g., Tenn. Code Ann. sec. 47-9-403 (1964). Petitioner continued its financial arrangement with Louisville Trust at least until December 31, 1974. The nature and size of recording and attorneys' fees compel us to conclude that petitioner was reasonably certain of successful renegotiations with the bank for loans covering future seasonal financial needs. It had no reason to expect Louisville Trust would not accommodate these loans unless its credit picture changed dramatically. Petitioner has shown no facts, known to exist or reasonably estimated to exist when it filed its return for the year ended June 30, 1969, which we believe significantly impaired its future credit relationship with the bank. It is incredible that petitioner was not reasonably certain to attempt and to obtain loan renewals to avoid an annual expenditure of over $12,000. See *Westinghouse Broadcasting Co. v. Commissioner, supra* at 919. We simply are not convinced that it would necessarily repeatedly incur such an expense.

Moreover, petitioner has rested its entire argument on the fact that loan expenses were attributable solely to the loan for the 1968-69 season. As a result, our finding that the loan expenses benefited all loans with Louisville Trust leaves it with no evidence in the record as to reasonable approximations as to the number of loans it would obtain. On the basis of such a record, we are forced to sustain respondent's determination that the loan expenses covered petitioner's entire financial arrangement period with Louisville Trust and that this period had an indeterminate useful life. Accordingly, petitioner is not entitled to any amortization for the $12,960 recording and attorneys' fees in its fiscal year ended June 30, 1969.

### Issue 3. Payment of Foreign Subsidiary's Taxes

We must determine whether petitioner or its Mexican subsidiary, Mexicanos, received the benefit of (and therefore incurred and may deduct) the tax expense. Petitioner acknowledges the Mexican taxes were the expense of Mexicanos, but it contends it nevertheless is entitled to a deduction for the reimbursement of

the expense where the payment was for its own benefit. Petitioner points to two such benefits: protection of its foreign investment and reduction of its overhead burden for salaried personnel. Respondent, in contrast, asserts that Mexicanos alone was the benefactor of the services rendered to it.

Business expenses which satisfy the ordinary and necessary requirements of section 162 are deductible if they are proximately connected to the business activities of the taxpayer claiming the deduction. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 15.08, p. 15–46 (3d ed. 1971). Expenses incurred for the benefit of another taxpayer are clearly not deductible under section 162 (*Interstate Transit Lines v. Commissioner*, 319 U.S. 590 (1943); *Deputy v. DuPont*, 308 U.S. 488 (1940)), but if the taxpayer pays the expense of another for its own proximate and direct benefit, a deduction may be allowable. *Young & Rubicam, Inc. v. United States*, 187 Ct. Cl. 635, 410 F.2d 1233, 1238–1239 (1969); *Columbian Rope Co. v. Commissioner*, 42 T.C. 800 (1964).

Our careful review of the record on this issue compels us to conclude that petitioner undertook the payment of Mexicanos' taxes simply to aid its wholly owned foreign subsidiary to obtain the services of needed manangement personnel. As a result, the payment of the taxes does not fall within the narrow exception allowing deduction for the payment of another's expense where the payor receives the proximate and direct benefit of the payment.

Petitioner's argument that it loaned, on a full-time basis, supervisory and administrative personnel to safeguard its foreign investment simply does not withstand analysis. It is clear from the record that these employees resided in Mexico and rendered their exclusive management services to aid Mexicanos. Petitioner paid their salaries and Mexicanos' tax on their salaries and was reimbursed by Mexicanos for the amount of salary paid; the net effect of this salary arrangement was that petitioner paid Mexicanos' tax on the salaries. We are uncertain why the unusual salary payment reimbursement relationship was adopted rather than merely allowing Mexicanos to pay the salaries in question, but the fact remains that these personnel performed services exclusively for Mexicanos. No doubt this relationship enhanced the successful operation of Mexicanos which benefited petitioner as its owner, but this type of indirect and incidental

benefit is not enough to justify petitioner's deduction. *Columbian Rope Co. v. Commissioner, supra* at 815–816. Petitioner simply cannot claim as its own expense, amounts paid for activities that were concerned with the day-to-day operation of the subsidiary's business. *Young & Rubicam, Inc. v. United States, supra* at 1239.

We are also not convinced by petitioner's argument relating to the sharing of its technical employees on a part-time basis in the off-season. Petitioner claims that it paid Mexicanos' taxes on these salaries to reduce its overhead of maintaining these personnel on a year-round basis. We agree that reduction of overhead may be the kind of proximate and direct benefit necessary to bring petitioner within section 162; however, the payment must still withstand the ordinary and necessary requirements of that section. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, *supra*. A test for determining deductibility in this context is whether a hardheaded businessman, under the circumstances, would have incurred the expense. *B. Forman Co. v. Commissioner*, 453 F.2d 1144, 1160 (2d Cir. 1972), cert. denied 407 U.S. 934 (1972).

Robert Austin testified that such technical personnel were also hired out to other unrelated tobacco processors. But the record does not reflect that petitioner offered to pay any taxes the unrelated companies may have incurred on the compensation arrangement. Absent compelling evidence to the contrary, we do not believe petitioner would have or did enter into a similar financial relationship with any unrelated company. As a result, we believe petitioner's payment of the Mexican taxes relative to the technical personnel was a gratuity; a payment incurred simply to aid its wholly owned subsidiary. This is hardly an expense an astute businessman would incur in an unrelated arm's-length transaction.

Accordingly, we hold that the entire amount of Mexican taxes paid by petitioner to Mexicanos in fiscal years 1969, 1970, and 1971 is not deductible.

### Issue 4. Worthlessness of Stock and Debt in Tabacol

We must decide whether petitioner's stock and debt to Tabacol became worthless in fiscal year ended June 30, 1971. Petitioner supports its June 30, 1971, ordinary loss deduction of $388,022 by separating its loss into two elements; a stock loss of $112,500,

the amount of petitioner's investment in Tabacol stock; and a partially worthless bad debt of $275,522, the amount of loans and accounts receivable outstanding on June 30, 1971, as increased by respondent's adjustment and decreased by estimated receivables from Tabacol.

Petitioner argues section 165(g) entitles it to an ordinary loss of $112,500 with regard to its worthless stock in Tabacol on June 30, 1971. In addition, petitioner argues section 166(a)(2), treating partially worthless debts, entitles it to an ordinary loss of $275,522 with regard to its worthless loans to Tabacol on June 30, 1971. Respondent contends simply that neither Tabacol's stock nor any portion of its debts to petitioner was worthless as of June 30, 1971. Moreover, respondent argues that even if these items were worthless, petitioner may not increase its deduction for partially worthless debts for its fiscal year ended June 30, 1971, by $129,045, the amount of respondent's adjustment for fiscal year ended June 30, 1965, since petitioner did not charge off that amount as required by section 166(a)(2).

We turn first to petitioner's contention that section 165(g) entitles it to an ordinary loss deduction of $112,500. Generally, a taxpayer owning stock, which is a capital asset, is entitled to a capital loss in the year in which the stock becomes wholly worthless. Secs. 165(a), 165(g)(1), and 165(g)(2)(A). Under section 165(g)(3), however, a loss incurred by a domestic corporation on wholly worthless stock in an affiliated corporation may be converted from a capital loss to an ordinary loss. Sec. 1.165–5(d)(1), Income Tax Regs.

Worthlessness is a factual question and petitioner has the burden of proof to overcome respondent's determination that its stock in Tabacol did not become worthless in fiscal year ended June 30, 1971. *Boehm v. Commissioner*, 326 U.S. 287, 294 (1945); *Mueller v. Commissioner*, 60 T.C. 36 (1973), affd. in part 496 F.2d 899 (5th Cir. 1974); Rule 142(a), Tax Court Rules of Practice and Procedure. We are convinced petitioner has satisfied its burden on this issue.

In *Morton v. Commissioner*, 38 B.T.A. 1270, 1278–1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940), the Board set forth the following standards for determining worthlessness:

a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a

reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock.

The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.

Thus, in order to establish worthlessness, petitioner must show a relevant identifiable event in Tabacol's corporate life which clearly evidences destruction of both the potential and liquidating values of the stock.

In our opinion, the series of events spanning March 12, 1971, to June 30, 1971, provide overriding evidence of the loss of both the potential and liquidating values of the Tabacol stock. On March 12, 1971, petitioner's directors resolved to sell Tabacol's assets and liquidate it. Pursuant to this directive, an independent appraisal was made of Tabacol's assets on April 30, 1971, and on June 14 and 28, 1971, respectively, binding contracts for the sale of the assets, as appraised, were executed. These contracts fixed the liquidating value of the assets sold and, for the most part, fixed the liquidating value of Tabacol. The current balance sheet for Tabacol for the fiscal year ended June 30, 1971, reflecting the sale showed a deficit net worth of $258,976.96. Since the liabilities exceeded assets on June 30, 1971, Tabacol had no liquidating value. *Morton v. Commissioner, supra* at 1279.

Potential value is that value to be derived through foreseeable future operations. *Morton v. Commissioner, supra* at 1279. The parties agreed that on June 30, 1971, Tabacol was no longer operational as it had ceased operations entirely and was winding up its affairs. We believe such an event following a binding commitment to sell its assets is an "identifiable event" in Taba-

col's corporate life which put an end to any reasonable hope and expectation of any potential value. Accordingly, we find petitioner sustained an ordinary loss of $112,500 as a result of its stock in Tabacol becoming wholly worthless in the fiscal year ended June 30, 1971.

We turn next to petitioner's contention that it is entitled to a deduction under section 166(a)(2) for a partially worthless bad debt of $275,522, the amount charged off and deducted on petitioner's return, $146,477, plus respondent's adjustment which increased petitioner's loan account with Tabacol by $129,045.

Section 166(a)(2) provides as follows:

SEC. 166. BAD DEBTS.
  (a) GENERAL RULE.—

      *     *     *     *     *     *     *

   (2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not is excess of the part charged off within the taxable year, as a deduction.

Respondent is accorded discretion in determining the availability of a deduction for a partially worthless debt (*Mayer Tank Mfg. Co. v. Commissioner*, 126 F.2d 588 (2d Cir. 1942), affg. a Memorandum Opinion of the Board of Tax Appeals; *Findley v. Commissioner*, 25 T.C. 311, 318 (1955), affd. per curiam 236 F.2d 959 (3d Cir. 1956)), and his exercise of discretion cannot be disturbed unless it is arbitrary and unreasonable. *Wilson Bros. & Co. v. Commissioner*, 124 F.2d 606, 609 (9th Cir. 1941), affg. on this issue a Memorandum Opinion of the Board of Tax Appeals.

Respondent's discretion over partial worthlessness is not absolute, however; it must be tempered with reason. *Estate of Harris Fahnestock v. Commissioner*, 2 T.C. 756, 759 (1943). A taxpayer may overcome respondent's determination by showing that, considering all the facts and surrounding circumstances, a part of the debt is not recoverable. *Bullock v. Commissioner*, 26 T.C. 276, 299 (1956), affd. per curiam 253 F.2d 715 (2d Cir. 1958); sec. 1.166–2(a), Income Tax Regs. In this regard, respondent may not ignore the soundly exercised business judgment of a taxpayer's officers in determining partial worthlessness. Such judgment is relevant in evaluating the reasonableness of respondent's exercise of discretion granted him by section 166(a)(2). *Portland Mfg. Co. v. Commissioner*, 56 T.C. 58, 73 (1971), affd. in an unreported opinion (9th Cir. 1975, 35 AFTR2d 75–1439, 75–1 USTC par.

9449). Thus, if management's business judgment is supported by facts establishing partial worthlessness, respondent's exercise of discretion will be overturned.

In its fiscal year ended June 30, 1971, petitioner charged off and deducted $146,476.96 of its total unpaid loans with Tabacol. As we have found in our discussion treating the worthless Tabacol stock, Tabacol was insolvent on June 30, 1971, showing a balance sheet deficit of $258,976.96. On that date, Tabacol owed petitioner $621,099.77. This amount was reduced by $425,007.81 the net cash received from Tabacol's asset sale to Extacol, to a balance of $196,091.96. Petitioner then estimated it would recover an additional $49,615 after Tabacol's liquidation of its remaining assets and payment of remaining debts to third parties. Thus, of the total remaining debt of $196,091.96 on June 30, 1971, petitioner charged off and deducted $146,476.96 as worthless, estimating it would recover $49,615 of the total debt in the future.

The $49,615 estimated future recovery was reflected on Tabacol's June 30, 1971, balance sheet by listing Tabacol's remaining unsold assets at estimated liquidation value ($608,712) and by listing its liabilities to banks and third parties (other than petitioner) at face value ($559,097). All but $12,000 of the $608,712 estimated asset values were current liquid assets consisting of cash, receivables, inventories, and dollar exchange rights which all had a readily ascertainable value. Obviously, this balance sheet was not overly optimistic since petitioner never received the $49,615, but was instead forced to pay $20,460 in additional expenses on behalf of Tabacol in a later year. This resulted in an additional $70,075 unpaid debt from Tabacol which petitioner deducted in fiscal year ended June 30, 1972.

Clyde Austin, Tabacol's president, prepared the balance sheet reflecting an estimated recovery of $49,615. He testified that the balance sheet was based upon his business judgment as an experienced tobacco operator and as a certified public accountant. It is clear from the record that Clyde Austin had an extensive background in the tobacco industry on a management level. He appeared credible and we find no reason to doubt his testimony.

In short, petitioner wrote its Tabacol indebtedness down to what Clyde Austin felt was the salvage value of Tabacol's assets which petitioner, as debtor, would recover. This estimate was based, in part, on a determination that Tabacol had no going

concern or future potential values. The record supports this determination. We have already found in our discussion on worthless stock that Tabacol had no potential value as a going concern because of the series of events terminating its corporate life. We see no reason to repeat that discussion here. Suffice it to say that we are convinced Tabacol was genuinely liquidating and was, as of June 30, 1971, no longer operating. It was in the process of winding up its affairs for final asset distribution, if any, to stockholders and was no longer conducting any business. Cf. *Sika Chemical Corp. v. Commissioner*, 64 T.C. 856 (1975), affd. in an unpublished opinion 538 F.2d 320 (3d Cir. 1976).

Under these circumstances, we see no reason to challenge petitioner's sound business judgment in writing its debt down to the estimated salvage value of assets it was to receive upon final liquidation distribution. Accordingly, we find that respondent exceeded his discretion in finding no part of Tabacol's debt to petitioner was worthless.

Finally, since we have found that petitioner's debt was partially worthless because it was recoverable only to the extent of $49,615, petitioner urges us to allow a deduction not only for $146,477, the amount charged off and deducted in fiscal year ended June 30, 1971, but also for $129,045, the amount of respondent's adjustment to petitioner's loan account with Tabacol. Petitioner asks us to go too far.

The $129,045 was not recorded on either petitioner's or Tabacol's books when the petitioner's return for fiscal year ended June 30, 1971, was filed. As a result, that amount was not charged off and deducted in fiscal year 1971. Section 166(a)(2) clearly requires that a taxpayer will only be allowed a deduction for a partially worthless debt "in an amount *not in excess* of the part *charged off* within the taxable year." (Emphasis added.) Since petitioner did not actually charge off the $129,045 in fiscal year ended 1971, it is not entitled to a deduction therefor. This result is mandated by the clear language of the statute. The fact that it was impossible for petitioner to charge off the $129,045 in that year since it was not aware of the debt is irrelevant. The statute requires, as a threshold limitation, a specific charge off of the precise dollar amount that petitioner wishes to deduct. Petitioner did not satisfy this requirement as to the $129,045.

Accordingly, it is not entitled to a deduction for that amount. To reflect the foregoing,

*Decision will be entered under Rule 155.*

