T.C. Memo. 1998-162


UNITED STATES TAX COURT


EMHART CORPORATION & DOMESTIC SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20025-95.                          Filed May 5, 1998.


<u>Herbert Odell</u>, <u>Joel C. Weiss</u>, <u>Samuel M. Maruca</u>, and <u>Philip Karter</u>, for petitioner.

<u>Richard H. Gannon</u> and <u>Linda A. Love</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  Respondent determined a $369,046 deficiency in petitioner's 1984 Federal income tax.  The issue for decision is whether petitioner's stock in United Shoe Machinery Portugal (USMP) became worthless in 1984.  We hold that it did.  All

section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time it filed its petition, petitioner's principal place of business was in Towson, Maryland.

Petitioner filed a consolidated Federal income tax return for 1984, on which it claimed an ordinary loss of $802,273 relating to the sale of its USMP stock. During and prior to 1984, USMP imported, manufactured, and marketed shoe materials; imported, refurbished, marketed, and serviced shoe machinery; and manufactured cutting dies for footwear and textile industries. USMP resold machinery and materials produced by petitioner and its subsidiaries, and consequently, USMP's costs of goods sold consisted largely of purchases from such entities.

From 1980 through 1983, USMP's sales rapidly declined, while its operating expenses rose. USMP's inability to reduce expenses largely was due to labor costs. Approximately 75 to 80 percent of the company's expenses were attributable to wages and salaries. Under Portuguese law, employers who terminated employees without cause were required to pay such employees at least 3 months' severance pay for each year they had worked for their employer. USMP attempted to reduce its labor costs by

offering its employees up to 3 years' severance pay if they left the company.  No employees accepted the offer, however, because no other jobs were available.

In 1982, petitioner contributed to USMP $261,000 of additional capital by converting into equity a comparable amount of payables that USMP owed petitioner.  Despite this cash infusion, USMP continued to fall behind in paying for goods purchased from petitioner and its subsidiaries.  Although petitioner was unwilling to advance additional cash, it agreed to extend USMP's payables beyond the 60 days in which members of the consolidated group generally paid one another for merchandise. Petitioner extended the payables again in 1983.

Despite these remedial measures, USMP's financial condition worsened and such deterioration was exacerbated by an unstable political climate and extreme inflation.  USMP's net income or loss, converted from Portuguese escudos to U.S. dollars, was a follows:

|    1980    |    1981    |    1982    |    1983    |
|------------|------------|------------|------------|
| $40,207 | $52,107 | ($113,917) | ($117,278) |

As of December 31, 1983, USMP had a net worth (i.e., assets minus liabilities) of negative $35,371.

As a result of USMP's decline in sales revenue, petitioner's inability to reduce USMP's expenses, and USMP's substantial losses in 1982 and 1983, petitioner concluded in early 1984 that

it should either liquidate or sell USMP. Petitioner estimated that its losses upon liquidation would be $495,000, including $148,000 as the estimated cost of discharging employees under Portuguese labor laws. Faced with these costs, petitioner decided to sell USMP even if USMP had to be sold for nominal or no consideration.

On October 24, 1984, petitioner sold all of its USMP stock to a group of Portuguese businessmen in exchange for 1,000 escudos ($6.17) and petitioner's waiver of $110,000 in payables that USMP owed petitioner. The buyers personally guaranteed payment of the remaining payables that USMP owed petitioner. These liabilities were valued at approximately $220,000. At the time of the sale, petitioner's basis in the USMP stock was $802,273.

On its balance sheet dated October 25, 1984, USMP reported a net worth of 4,743,000 escudos ($29,501). The balance sheet included a reduction in current liabilities of 17,685,000 escudos to reflect petitioner's forgiveness of the $110,000 payables. Without this reduction, USMP's net worth was negative 12,942,000 escudos ($80,499).

## OPINION

The sole issue is whether petitioner's USMP stock became worthless in 1984. If so, both parties agree that section 165 entitles petitioner to an ordinary loss equal to its adjusted

basis in its USMP stock.  Sec. 165(g)(3).  To prevail, petitioner must establish that its USMP stock ceased to have both "liquidating value" and "potential value" during the year in which the worthlessness is claimed.  Austin Co. v. Commissioner, 71 T.C. 955, 970 (1979); Steadman v. Commissioner, 50 T.C. 369, 376 (1968), affd. 424 F.2d 1 (6th Cir. 1970); Morton v. Commissioner, 38 B.T.A. 1270, 1278 (1938), affd. 112 F.2d 320 (7th Cir. 1940).

A corporation does not have a liquidation value if the value of its liabilities exceeds the value of its assets.  Steadman v. Commissioner, supra at 376-377.  On the day after the sale, USMP reported a net worth of $29,501.  This figure, however, included a reduction for petitioner's waiver of $110,000 in current liabilities.  Thus, before the sale, USMP had a negative net worth of $80,499.  Therefore, we conclude that in 1984 when petitioner sold and claimed a deduction relating to its USMP stock, such stock had no liquidating value.

A loss of potential value is ordinarily established by the occurrence of an "identifiable event" that destroys any reasonable expectation that the assets will exceed the liabilities in the future.  Id. at 376.  An identifiable event includes the sale of property.  See, e.g., United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 401 (1927); Proesel v. Commissioner, 77 T.C. 992, 1005 (1981).  Respondent contends that at the time of the sale USMP had potential value because the

buyers personally guaranteed $220,000 in payables that USMP owed petitioner.  Respondent ignores, however, that the buyers received assets that were nearly equivalent to the liabilities that they guaranteed.  Moreover, the buyers guaranteed liabilities that were already owed petitioners, and USMP would have been insolvent in the buyers' hands but for petitioner's waiver of $110,000 in payables.  After USMP experienced declining sales revenue, high and uncontrollable labor costs, and 2 consecutive years of net losses, petitioner accepted the nominal sum of $6.17 and relinquished its right to $110,000 in payables for which USMP was liable.  In essence, petitioner paid the buyers to take USMP.

Respondent also contends USMP had potential value, because the buyers continued to operate the company.  The continued operation of a corporation, however, does not by itself establish value in stock.  Steadman v. Commissioner, supra at 378. Therefore, we conclude that in the year of sale, the stock had no potential value.  Accordingly, we hold that petitioner's USMP stock became worthless in 1984.

All other contentions made by the parties are either irrelevant or without merit.

To reflect the foregoing,

Decision will be entered
for petitioner.