T.C. Memo. 2016-46

UNITED STATES TAX COURT

KAYLAN J. RILEY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22718-12L.                    Filed March 10, 2016.

<u>Anthony V. Diosdi</u>, for petitioner.

<u>John Chinnapongse</u>, <u>Kelley A. Blaine</u>, and <u>Don Priver</u>, for respondent.

MEMORANDUM OPINION AND FINDINGS OF FACT

HOLMES, <u>Judge</u>:  From 2003 to 2008 Kaylan Riley paid over $1 million to Frank Nemirofsky, thinking that she was investing in a tech startup.  She began to suspect that he was using her money for other purposes.  In 2010, when the Commissioner came to collect Riley's unpaid taxes from 2008, she claimed that Nemirofsky had stolen her money and that she would be entitled to a theft loss

**[\*2]** deduction that she could carry back to eliminate that liability. We must decide whether Nemirofsky's actions amount to theft or create some other kind of deductible loss.

OPINION

This is a collection due process (CDP) case in which the parties do not disagree about the law. They agree that Riley is entitled to challenge her 2008 tax liability because the Commissioner never sent her a notice of deficiency and she didn't have another opportunity to dispute the liability. See sec. 6330(c)(2)(B); Montgomery v. Commissioner, 122 T.C. 1, 8 (2004).[1] They agree that when the amount of the underlying tax liability is at issue, we review the determination *de novo*. Sego v. Commissioner, 114 T.C. 604, 609-10 (2000). And they agree there's only one issue in this case: whether Riley suffered a deductible loss in 2010 as a result of her dealings with Nemirofsky that she can somehow carry back to reduce her 2008 tax liability; if not, her 2008 tax liability will remain and the Commissioner can collect it.

Riley argues in her brief only that she sustained a theft loss, but because she'd previously also argued that she might deserve treatment under the bad-debt

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code for the year at issue; and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*3]** and worthless-securities loss rules, we consider them as well. We'll start with a brief review of the law.

I.     Theft Losses

Section 165(a) allows a deduction for any loss sustained during a tax year and not compensated for by insurance or otherwise. Section 165(c) limits this rule for individuals, but it allows deductions for losses that arise from casualty or theft. Sec. 165(c)(3). To claim a theft-loss deduction, a taxpayer must prove (1) that a theft occurred under the law of the jurisdiction where the loss occurred, Monteleone v. Commissioner, 34 T.C. 688, 692 (1960); (2) the amount of that loss, Elliott v. Commissioner, 40 T.C. 304, 311-12 (1963); and (3) the year in which she discovered the loss, sec. 165(e); sec 1.165-8(a)(2), Income Tax Regs. The burden of establishing a theft loss is on the taxpayer, who must prove that a theft, and not just a mysterious disappearance of her property, occurred. Jacobson v. Commissioner, 73 T.C. 610, 613 (1979).

Riley alleges that Nemirofsky committed theft by false pretenses under California law. California has combined the various types of common-law property crimes such as larceny and embezzlement under the single crime of "theft". Cal. Penal Code sec. 484 (West 2010). Combining several crimes under the general term "theft" has not, however, eliminated the substantive distinctions

[*4] between the different types.  People v. Davis, 79 Cal. Rptr. 2d 295, 297-298 (1998).  The species of theft at issue here is theft by false pretenses, the elements of which are (1) a false representation, (2) made with intent to defraud, (3) that causes the owner of property to part with it in reliance on the false representation.  People v. Randono, 108 Cal. Rptr. 326, 331 (Ct. App. 1973); People v. Brady, 80 Cal. Rptr. 418, 426 (Ct. App. 1969).

A taxpayer must also prove the amount of the theft loss to claim a deduction.  Elliott, 40 T.C. at 311-12.  The amount of the deduction is the lesser of the fair market value of the stolen property or its basis.  Sec 1.165-7(b)(1), Income Tax Regs.

Theft-loss cases can also present tricky questions of timing.  The Code treats a loss as sustained during the tax year in which a taxpayer discovers it.  Sec. 165(e).  This means a taxpayer may not claim a deduction in the taxable year in which the theft actually occurs unless the taxpayer also discovers the theft in that year.  Sec. 1.165-8(a)(2), Income Tax Regs.  A taxpayer may also not claim a deduction for any portion of the loss for which she has a claim for reimbursement with a reasonable prospect of recovery.  Id. sec. 1.165-1(d)(3).  Thus, to claim a theft-loss deduction for a particular year, a taxpayer must discover the loss in that year and show she has no reasonable prospect of recovery.

**[\*5]** II.     <u>Bad Debt</u>

There are situations where a taxpayer may have suffered a loss, but not quite a theft loss--a really sour deal but not one amounting to theft by the party who comes out ahead, for example.  If a debt was created, section 166(a) allows a deduction for debt that becomes worthless in the tax year.  If the bad debt is business related, the deduction is against ordinary income.  Nonbusiness bad debt is treated as a short-term capital loss.  Sec. 166(d)(1)(B).  This distinction is important, as capital losses may offset up to only $3,000 of ordinary income a year.  Sec. 1211(b)(1).  A taxpayer with a large amount of ordinary income would usually prefer a business bad-debt deduction rather than a nonbusiness bad-debt deduction--a taxpayer would also prefer a theft-loss deduction over a nonbusiness bad debt deduction for the same reason.

Nonbusiness bad debt is debt "other than * * * a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer," sec. 166(d)(2); this is a question of fact determined in each particular case, sec. 1.166-5(b), Income Tax Regs.  Like a theft loss, a nonbusiness bad-debt loss is sustained only when the debt has become totally worthless (i.e., there is no reasonable chance of recovery).  Sec. 1.166-5(a)(2), Income Tax Regs.; <u>Horne v. Commissioner</u>, 523 F.2d 1363, 1365 (9th Cir. 1975), <u>aff'g</u> 59 T.C. 319 (1972).

**[*6]** III.    <u>Worthless Securities</u>

As we'll see, Riley's loss comes from what she calls an investment. This creates another possible deduction for her--a worthless security. If a security that is a capital asset becomes worthless, section 165(g) allows a taxpayer to treat it as a capital loss. If the security is not a capital asset, the taxpayer may claim an ordinary loss. Sec. 1.165-5(b), Income Tax Regs. The Code defines a security as a "share of stock in a corporation," "a right to subscribe for, or to receive, a share of stock in a corporation," or a "bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government * * * with interest coupons or in a registered form." Sec. 165(g)(2). As with nonbusiness bad debt, the loss from a worthless security that is a capital asset is a capital loss, and a taxpayer may offset only $3,000 of ordinary income a year with such a loss. Sec. 1211(b).

To give rise to a deduction, a security must actually be worthless. If it has any recognizable value, a taxpayer can't claim a deduction. "A mere shrinkage in value of the stock owned by the taxpayer, even though extensive, does not give rise to a deduction under section 165(a)." Sec. 1.165-4(a), Income Tax Regs. Thus, as with a theft loss or a bad debt loss, a taxpayer must show there is no reasonable chance of recovery.

**[\*7]**   As we've said, the parties agree on the law.  If Nemirofsky's actions amount to theft by false pretenses under California law, and if Riley has no chance of recovery, Riley may take a theft-loss deduction against her ordinary income.  If the money Riley gave Nemirofsky was a loan or in exchange for securities, and if she has no reasonable chance of recovery, she may take a bad-debt or worthless-securities loss.

The parties disagree on the facts, specifically the issues of whether Nemirofsky actually made false representations and whether Riley actually has no chance of recovering her money.  We tried the case in San Francisco, and Riley remains a California resident as she was when she filed her petition.

FINDINGS OF FACT

A.   <u>Riley and Nemirofsky</u>

In 2002 Riley and her husband divorced.  Riley's ex-husband worked in management at Chevron during their marriage and made a good living.  As part of their divorce settlement, she therefore received a 401(k) and an IRA, each worth roughly $1 million.  She also started receiving $4,300 a month in alimony, which was to last for nine years.  Riley used this money to buy a house in Danville, California.

**[*8]** In 1998--while she was still married--Riley began working at Blockbuster as a sales associate for $7.25 an hour. She met Nemirofsky at Blockbuster in 1999. They lived in the same neighborhood and had children at the same school, and their relationship blossomed to the point that they'd meet several times outside Blockbuster to get coffee.

It was at one of those friendly coffees that Nemirofsky told Riley about an invention of his called the Ribbon. It allegedly allowed a user to point a cell phone at a television and interact with whatever was on the screen. Nemirofsky told Riley that he had received a patent for the Ribbon and was seeking investors for Exphand, his company. Riley is not a financially sophisticated person. She has only a high-school education and little business knowledge, and she bought Nemirofsky's story. Over the next five years she wrote more than a dozen checks to him or Exphand. Some of these checks were payable to Nemirofsky, and some were payable to Exphand. For some she received promissory notes, and for some she received nothing tangible in return. While the actual purpose of each payment is not clear, the following table summarizes the available information.

| [*9] | **Riley's Payments to Nemirofsky and Exphand** | | | |
|---|---|---|---|---|
| **Date** | **Amount** | **Payee** | **Check notation** | **Exchanged for** |
| 1/1/2003 | $20,000 | Nemirofsky | For Exphand | Note that could be exchanged for stock |
| 1/27/2006 | 50,000 | Nemirofsky | | |
| 2/14/2006 | 20,000 | Nemirofsky | | |
| 2/15/2006 | 10,000 | Nemirofsky | | |
| 5/8/2007 | 20,000 | Nemirofsky | For Exphand | |
| 8/10/2007 | 10,000 | Nemirofsky | For Exphand | |
| 8/30/2007 | 10,000 | Nemirofsky | | |
| 8/30/2007 | 10,000 | Nemirofsky | | |
| 10/6/2007 | 10,000 | Nemirofsky | | |
| 10/9/2007 | 20,000 | Nemirofsky | 20/100 | [1]Promissory note for $100,000 |
| 11/10/2007 | 80,000 | Nemirofsky | | |
| 2/7/2008 | 20,000 | Nemirofsky | | |
| 2/21/2008 | 15,000 | Nemirofsky | | |
| 5/8/2008 | 10,000 | Nemirofsky | | |
| 5/9/2008 | 2,000 | Nemirofsky | | |
| 6/26/2008 | 200,000 | Nemirofsky | | |
| 8/26/2008 | 800,000 | Exphand | For Exphand | Promissory note convertible to stock |
| 12/4/2008 | 2,000 | Nemirofsky | (illegible) | |
| **Total** | **1,309,000** | | | |

**[\*10]** [1]At trial Riley presented what she alleged was a promissory note for $100,000 executed around the time of the October and November payments. The purpose of this note is unclear.

Riley testified at trial that she wrote all the checks because she thought she was investing in Exphand. She claimed she made some checks out to Nemirofsky personally, rather than Exphand, because he told her to do so. To cover some of the checks, Nemirofsky encouraged Riley to take out an equity line of credit against her house, and she did. She made other payments with distributions from the IRA that she had received in her divorce.

Around 2006 or 2007, Riley said, she noticed a change in Nemirofsky's standard of living. She testified that his house seemed to improve, he acquired a new Mercedes, and he began to wear nicer clothes. In 2010 Wendy Wallace, a friend of Riley's, began working for Nemirofsky. Riley claims to have learned from Wallace that things were not right at Exphand and that Nemirofsky had not used the money properly.

Riley began asking for her money back, and she hired an attorney, Nina Yablok, to assist her. Yablok wrote a letter to Nemirofsky in June 2010 to argue that he breached his fiduciary duties and disclosure obligations and request immediate repayment of $280,000 along with information about the future prospects of Exphand. Riley also consulted with the law firm Fitzgerald, Abbott

[*11] & Beardsley, where lawyers told her they would take her case against Nemirofsky on contingency, but she would need to pay $10,000 up front for expenses. She declined to retain the firm because of this retainer. Riley also told the FBI about Nemirofsky, but the government chose not to pursue the case. Throughout this time, Riley and Nemirofsky remained in contact, speaking at least eight times in December 2013 alone. Riley testified that Nemirofsky has stated he wants to return her money to her.

Riley's initial 2008 tax return showed about $1.3 million in income from the IRA distributions she used to help fund her payments to Nemirofsky and Exphand. Her 2008 return reported a tax liability of nearly $430,000. This amount was the basis for the Commissioner's initial assessment and subsequent filing of a federal tax lien in 2010. Riley claims that in 2008 she began to suspect that Nemirofsky had stolen her money, and for 2010 she reported a $1,330,000 theft loss on her tax return. This theft loss created a large net-operating-loss carryback, which she then applied on an amended 2008 return to offset her IRA income and significantly reduce her tax liability for that year.

The Commissioner argues that even if we find Riley's testimony credible, the admissible facts don't establish a theft-loss, a bad-debt, or a worthless-securities deduction.

**[\*12]** B.    <u>Theft Loss</u>

We look at the theft loss first, and the Commissioner begins with an objection to Riley's use of hearsay statements made by Wallace and Nemirofsky. While Riley testified at trial, Nemirofsky and Wallace were conspicuously absent. Thus, many of the statements on which Riley bases her case--promises from Nemirofsky about the Ribbon and investment returns, reports from Wallace about lies and financial wrongdoing at Exphand--are inadmissible hearsay if used to prove the truth of the matters asserted in them.  <u>See</u> Fed. R. Evid. 801.  We admitted these statements not for their truth but for the limited use of showing Riley's state of mind and why she grew suspicious.  But Riley can't use them to prove that Exphand had misused Riley's loans or contributions.  The reason neither party subpoenaed Nemirofsky and why Riley based most of her case on hearsay is unclear.  The consequence is clear: large holes in the factual record.

Without any evidence of Nemirofsky's statements or his own state of mind, there is no real proof of a theft loss.  Riley must show that a theft occurred as defined by California law.  <u>See</u> <u>Paine v. Commissioner</u>, 63 T.C. 736, 740 (1975), aff'd, 523 F.2d 1053 (5th Cir. 1975).  In California, theft by false pretenses requires a false representation and intent to defraud.  <u>Randono</u>, 108 Cal. Rptr. at 331.  California law also requires that proof of false pretenses be corroborated if

**[\*13]** the claim "rests primarily on the testimony of a single witness that the false pretense was made." <u>People v. Ashley</u>, 267 P.2d 271, 279 (Cal. 1954).

In <u>Kloosterhouse v. Commissioner</u>, T.C. Memo. 1981-481, we held that taxpayers didn't suffer a theft loss when they invested and loaned money to a company that subsequently went out of business. The taxpayers claimed they suffered a theft by false pretenses, but they presented no evidence of lies or false representations by the business owner. Simply asking for money for a business isn't a false representation, and there was no evidence that what the business owner said about his business was untrue.[2] Therefore, we found that the taxpayers failed to show a false representation and thus couldn't establish a theft loss.

Comparing <u>Kloosterhouse</u> to cases where there were false representations highlights what Riley has failed to show. In <u>Perry v. Super. Ct. of Los Angeles Cnty.</u>, 19 Cal. Rptr. 1, 6 (1962), the court found there were false representations when a party made statements about acquiring property and another witness who managed the property testified the acquisition had failed and the party would've known about it. In <u>Nichols v. Commissioner</u>, 43 T.C. 842, 886 (1965), a case on which Riley heavily relies, we allowed a deduction based on theft by false

---

[2] In <u>Kloosterhouse</u> we applied Maryland law, but Maryland law also requires showing a false representation and intent to defraud.

**[\*14]** pretenses because the seller of a tax-savings deal promised a specific type of transaction, and had corroborating evidence in the form of transaction records and testimony that showed the seller hadn't carried out the deal as promised. We found this was sufficient to prove false representations. Id.

Because Riley hasn't presented any admissible evidence to contradict what Nemirofsky allegedly said, she is more like the taxpayers in Kloosterhouse who failed to corroborate their claims of false representation. It is true that the use of an out-of-court statement to show false representations doesn't violate the hearsay ban when the statement's probative value is independent of its truth. United States v. Wellington, 754 F.2d 1457, 1464 (9th Cir. 1985); see also United States v. Roe, 670 F.2d 956, 964-65 (11th Cir. 1982) (holding that out-of-court statements weren't hearsay when the government used them to show falsity and deception rather than to establish their truth). Thus, we could possibly use Nemirofsky's and Wallace's out-of-court statements to establish the mere existence of statements, and then use corroborating *admissible* evidence to prove their falsity. But such corroborating evidence is missing in this case.

Riley submitted Exphand records at trial that showed only one $800,000 contribution from her. This doesn't contradict the fact that every other check Riley wrote was to Nemirofsky personally. Riley also presented a handwritten

**[*15]** document purporting to show equity investors in Exphand; her name doesn't appear on the list. Again, this doesn't contradict the evidence that all but one of her checks was to Nemirofsky personally. Further, because Wallace's statements about money mismanagement can't be used for their truth, they cannot corroborate the potential falseness of Nemirofsky's statements about how he would invest the money. Finally, Riley's testimony about Nemirofsky's new car and home improvements doesn't prove that he lied about his use of the money. There are many possible explanations for how Nemirofsky financed his lifestyle, and Riley has given no reason why her theory is the correct one. Therefore, the evidence in the case doesn't show that Nemirofsky made false representations.

The sparse record also prevents Riley from showing that Nemirofsky had an intent to defraud her. There must be actual proof of intent, and the mere showing of nonperformance or the falsity of a statement is insufficient. Ashley, 267 P.2d at 282. We recognize that proof of fraud can (and often must) come through circumstantial evidence and inference. See Perry, 19 Cal. Rptr. at 7. And one often can draw inferences from the existence of false representations. See, e.g., Ashley, 267 P.2d at 284 (holding that felonious intent could be inferred from repeated falsehoods); cf. Bellis v. Commissioner, 61 T.C. 354, 357-58 (1973) (finding no evidence of intent to defraud, even when the president of a company

**[\*16]** illegally sold stock to the taxpayers, because there was no proof that the president knowingly made false representations about the state of his company before it went bankrupt), aff'd, 540 F.2d 448 (9th Cir. 1976).

Due to the limited admissibility of Riley's testimony, however, the facts here are insufficient even to establish any false representations by Nemirofsky, much less an inference of intent to defraud based on the facts. Because Riley can't prove intent or false representation, she can't show that she suffered a theft by false pretenses under California law, and therefore she can't claim a theft-loss deduction under section 165(c).

C.    Other Types of Loss

Riley's inability to prove fraudulent intent does not preclude a bad-debt or worthless-securities deduction. To claim either of these deductions, Riley just needs to show that she lent or invested money, and that the debt or securities are now worthless. See secs. 165(g), 166. But at no point in the trial or in the CDP hearing did Riley argue that she lent Nemirofsky and Exphand money as part of a trade or business of her own. If Riley is entitled to any sort of bad-debt deduction, it must therefore be for nonbusiness bad debt, see sec. 166(d)(2), which would mean she at most gets a capital loss, which she cannot carry back from 2010 to 2008. The same is true of any worthless-security loss.

**[\*17]** The precise nature of each of Riley's payments is also unclear. At least $800,000 (the amount for which she received a promissory note) is a loan, and it is possible another $100,000 is as well. The rest of the payments are unclear: were they loans, or gifts, or equity investments?

We don't think we need to decide because it would not affect the outcome. To claim a bad-debt or worthless-securities deduction for 2010, Riley must show that the loans or stock became worthless in that year. For both types of deductions, this requires Riley to show that she had no reasonable chance of recovering her money. See sec. 1.166-5(a)(2), Income Tax Regs. (bad-debt deduction requires no reasonable chance of recovery); see id. sec. 1.165-4(a), Income Tax Regs. (stating that mere shrinkage in stock value is insufficient and there must be no recognizable value). For bad debt, "'[a] reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor.' * * * 'A lawsuit might well be justified by a 10% chance [of success].'" Jeppsen v. Commissioner, 128 F.3d 1410, 1418 (10th Cir. 1997) (alteration in original) (first quoting Ramsey Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974); then quoting Parmelee Transp. Co. v. United States, 351 F.2d 619, 628 (Ct. Cl. 1965)), aff'g T.C. Memo. 1995-342. For

**[\*18]** worthless securities, "stock may not be considered as worthless \* \* \* if there is a reasonable hope and expectation that it will become valuable at some future time." Austin Co. v. Commissioner, 71 T.C. 955, 969-70 (1979). Thus, to establish worthlessness, a "petitioner must show a relevant identifiable event \* \* \* which clearly evidences destruction of both the potential and liquidating values of the stock." Id.

Riley has not shown she lacks a reasonable chance of recovery. To the contrary, she testified that a law firm was willing to take her case on contingency; her decision not to pay $10,000 to retain the firm doesn't affect this. She credibly testified that she remains in contact with Nemirofsky, and she claims he wants to repay her. And she has not even suggested that Nemirofsky has insufficient funds to repay her. Cf. Halata v. Commissioner, T.C. Memo. 2012-351 (finding no chance of recovery after an investigation by the taxpayer determined the person against whom she had a claim had no recoverable assets). Riley also has not shown that any potential equity investment in Exphand is worthless. She has pointed to nothing other than Wallace's hearsay statement, and even that doesn't show destruction of the potential value of Exphand. See Austin, 71 T.C. at 970.

We are not holding that Riley will never be able to claim some sort of loss deduction. But on the basis of Riley's testimony at trial, we cannot say that Riley

**[*19]** had no reasonable chance of recovery *in 2010*. Nemirofsky is still around, and Riley is in contact with him. And she potentially has claims she can bring against him. It is simply too soon for her to claim any type of loss deduction, and she has shown no loss that she can carry back to offset her ordinary income for 2008.

<u>Decision will be entered for</u>

<u>respondent</u>.