T.C. Memo. 2001-276

UNITED STATES TAX COURT

FLINT INDUSTRIES, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10645-97.          Filed October 10, 2001.

<u>Mark H. Allen</u>, <u>Kevin L. Kenworthy</u>, and <u>Frances F. Hillsman</u>,
for petitioner.

<u>David G. Hendricks</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined the following
deficiencies in the Federal income tax of Flint Industries, Inc.,
and subsidiaries:

| FYE May 31 | Deficiency |
|------------|------------|
| 1989 | $66,096 |
| 1990 | 663,532 |
| 1991 | 1,014,268 |
| 1992 | 752,581 |

Flint Industries, Inc., and subsidiaries, hereinafter collectively referred to as petitioner, filed a petition to redetermine the deficiencies.[1]  Following concessions, the issue presented for decision is whether the following worthless stock and bad debt deductions claimed by petitioner on its consolidated Federal income tax returns for fiscal years ending (FYE) May 31, 1992, 1993, and 1994, are allowable under sections 165 and 166:[2]

| FYE May 31 | Worthless stock | Bad debt |
|------------|-----------------|----------|
| 1992 | $7,374,438 | $6,564,124 |
| 1993 | 2,435,876 | 815,105 |
| 1994 | -- | 6,085,248 |

Respondent contends that petitioner's worthless stock and bad debt deductions must be disallowed because (1) the amounts claimed as bad debts were capital in nature, and (2) petitioner has failed to prove that the alleged bad debts and worthless

_____

[1]Petitioner reported net operating losses (NOLs) for fiscal years ended 1992, 1993, and 1994 which it carried back to prior years.  Respondent's adjustments reduced the NOLs available to be carried back to prior years, resulting in the deficiencies determined by respondent in the notice of deficiency.

[2]All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts have been rounded to the nearest dollar or deutsche mark as appropriate.

stock were worthless in the taxable years the disputed deductions were claimed.[3]  Respondent concedes, however, that all of the disallowed worthless stock and bad debt deductions constitute a long-term capital loss for FYE May 31, 1994.

## FINDINGS OF FACT

Some of the facts, and pertinent German law, have been stipulated for purposes of these proceedings and are so found or stated.  The stipulations are incorporated herein by this reference.

## I. In General

At the time the petition was filed, Flint Industries, Inc. (Flint), was a corporation with its principal place of business in Tulsa, Oklahoma.  For all relevant years, Flint was the common parent of a group of affiliated corporations that filed a consolidated corporate income tax return for each of the taxable years at issue.[4]  For all relevant years, Flint used the accrual method of accounting and a fiscal year ended May 31.

---

[3]As a result of respondent's determination that petitioner was not entitled to the claimed bad debt deductions, respondent made a corollary adjustment to petitioner's interest income. Respondent agrees that this adjustment will be resolved consistent with our resolution of the bad debt issue.  Petitioner also alleges error in the computation of the deficiencies.  The parties agree that the computational matters will be addressed in the Rule 155 computation.

[4]In its reply brief, petitioner states that only Flint and its domestic subsidiaries filed consolidated returns for the years at issue; Günther, a foreign subsidiary, was not eligible to be included, and was not included, in the consolidated group.

During the years at issue, Flint was engaged primarily in the business of large-scale construction and oil and gas servicing. Flint's ability to conduct its business successfully depended heavily upon Flint's maintaining good banking and surety relationships.

In the late 1970s and early 1980s, Flint, directly or through its subsidiaries, purchased three electronics companies, one of which was W. Günther GmbH (Günther). Günther was an electronic component manufacturing firm located in Nürnberg, Germany. It was organized as a German Gesellschaft mit beshrankter Haftung (GmbH) and was classified as a corporation for U.S. tax purposes. Günther used the accrual method of accounting and a fiscal year ending on April 30.

II. Petitioner's Basis in Günther's Stock

Flint's majority-owned subsidiary, Flint Electronics Co. (Flint Electronics), purchased 100 percent of Günther's stock for $4,890,388 during FYE May 31, 1981. During FYE May 31, 1985, Flint Electronics contributed $484,050 to Günther's capital. As set forth more fully, infra, during FYE May 31, 1992, Flint Electronics contributed an additional $2 million to Günther's capital.[5] As of May 31, 1992, Flint Electronics' adjusted basis

---

[5]Although the parties stipulated to these facts, several exhibits in the case appear to contradict the facts regarding ownership. For example, Günther's commercial report for its FYE April 30, 1991, the audited financial statement required by
(continued...)

in its Günther stock, before taking into account the amounts at issue in this case, was $7,374,438.

III.  Günther's Management and Operations

Günther's geschäftsführer, Albert Günther (Albert), and its procurist, Hans Kampfrad (Kampfrad), controlled Günther's day-to-day management and operations.[6]  Albert reported directly to Flint's president.

Most of Günther's products were switches, relays, and sensor devices such as those used for air bags and braking systems.  The market for these products was highly cost-sensitive because Günther had several competitors that made similar products.

At some point before 1992, Günther was an industry leader in air bag sensor technology.  Subsequently, however, new products superseded Günther's technology and eroded its competitive advantage.  Although Günther owned patents for some of its manufacturing processes, by May 31, 1992, Günther's patents had

---

[5](...continued)
German law, states that Günther is a wholly owned subsidiary of Gordos International Corp., and Günther's commercial report  for its FYE April 30, 1992, states that Günther's share capital was transferred from Gordos International Corp. to Flint Electronics Co.  We accept the parties' stipulation, however, because the relevant facts regarding Günther's ownership by a member of the affiliated group and petitioner's adjusted basis in Günther's stock are not in dispute.

[6]The positions of geschäftsführer and procurist in a German GmbH are similar to those of general manager and controller in a U.S. company.  However, because the geschäftsführer and procurist were the only members of Günther's senior management, they had considerably more power and authority.

little or no value because the underlying technology was widely available in other forms.

IV. <u>Günther's Subsidiaries</u>

Günther was the majority owner of several subsidiaries that manufactured or sold products in India, France, Switzerland, and Germany (Berlin).  The French and Swiss subsidiaries were distribution outlets that sold Günther's products.  The Berlin subsidiary was essentially a manufacturing subcontractor for Günther.  The Indian subsidiary began as a joint venture in 1991. It operated a manufacturing facility that was supposed to produce Günther's products at a lower cost.  Günther's subsidiaries were valued at historical cost (book value) on Günther's balance sheet.  As of May 31, 1992, the subsidiaries' book values exceeded their fair market values.

V. <u>Flint's Guaranties of Günther's Bank Loans and Lease</u>

In the 1980s, Flint also provided some working capital to Günther and guaranteed certain of Günther's bank loans.  With one exception discussed below, all of these guaranties were given between 1983 and 1989.  During this period, Günther did not have much equity, it had a poor relationship with German banks, and its earnings were erratic.

At some point before January 1992, without the knowledge or approval of Flint's management,[7]  Günther obtained a loan of

---

[7]Although Flint had imposed restrictions on the authority of
(continued...)

roughly 2,500,000 deutsche marks (DM)[8] from Bankhaus Reuschel (Reuschel).[9]  In February 1992, when Reuschel indicated it would demand immediate payment of the loan without Flint's guaranty, Flint guaranteed the loan.  Because Günther was operating at a loss by then, Flint's management knew that guaranteeing the Reuschel loan was risky.  Still, Flint extended the guaranty, as it saw no economically reasonable alternative short of advancing Günther the cash to repay the note.

Günther's long-term liabilities also included a lease for Günther's building in Nürnberg.  This building was owned by Actium Leasobjekt GmbH & Co. KG (Actium), a limited partnership. Günther owned a 99-percent limited partnership interest in Actium.  In the early 1980s, shortly after acquiring Günther, Flint guaranteed the lease for Günther's building in Nürnberg.

Günther's bank loans were listed on its balance sheets as notes payable.  As of April 30, 1992, the principal balances of Günther's notes payable to banks totaled $10,976,220, and accrued

[7](...continued)
Günther's management to enter into loans, those restrictions on management's actual authority were unenforceable with regard to third parties because managers of a German GmbH have statutory authority to represent and bind the company in transactions with third parties.

[8]On average, 1 deutsche mark was worth approximately 60 cents during the years at issue.

[9]Flint decided to terminate Albert at least partly because of this transaction.  The terms of his severance were being negotiated when Flint discovered the Omega transaction (discussed infra), at which point Albert was abruptly fired.

interest thereon totaled $1,382,965.  Günther also owed Actium $4,942,343 under the terms of its lease.[10]

VI.  Petitioner's Efforts To Sell Günther During 1987-1990

In 1987, petitioner decided to focus on its core businesses and began efforts to sell Günther and its other electronics subsidiaries.  Petitioner engaged investment bankers in the United States and in Germany to find potential buyers, and the bankers endeavored to do so during 1988, 1989, and 1990.  As part of the sales effort, petitioner and its agents contacted hundreds of potential purchasers, and serious discussions were held with more than 10 companies.

In 1990, petitioner negotiated a letter of intent with a potential purchaser, AMETEK, to sell Günther for DM 11 million. The consideration included Flint's release from its guaranties of Günther's bank loans.  In late 1990, however, AMETEK withdrew its letter of intent for undisclosed reasons while conducting its due diligence investigation.  This withdrawal coincided with rising oil prices during the Gulf War and a general downturn in the European auto industry, during which the electronics and automotive industries suffered setbacks.

---

[10]Günther's liabilities were stated in deutsche marks.  The amounts in this paragraph have been converted to U.S. dollars using an exchange rate of .6025.

VII. <u>Günther's Financial Demise</u>

As of FYE May 31, 1990, the income statement of Günther and its subsidiaries showed a net profit of $387,962. During FYE May 31, 1991, petitioner began advancing cash to Günther so that Günther could service its bank loans and meet its short-term financial obligations. As of FYE May 31, 1991, the income statement of Günther and its subsidiaries showed a net loss of $414,443.

Early in FYE May 31, 1992, Günther management's interim reports to petitioner showed a fiscal-year-to-date loss of roughly DM 5 million ($3,012,500 approximately). From petitioner's perspective, this result was a disaster. Günther was unable to pay its bank loans and trade payables currently out of cashflow generated from its operations, and, consequently, petitioner had to advance the necessary funds to prevent a default by Günther on the guaranteed bank loans. Sometime later in FYE May 31, 1992, Günther's management reported that a capital contribution in the amount of $2 million was required to avert statutory bankruptcy under German law. Petitioner made the requested contribution to capital after Günther's management projected significant improvement in operating results for the latter half of Günther's FYE April 30, 1992.

Petitioner's management first became aware of the true severity of Günther's financial problems during July 1992, when

it discovered a transaction that would become known as the Omega transaction.

A.   The Omega Transaction and Petitioner's Discovery of Misleading Financial Reporting by Günther's Management

In the Omega transaction, Günther transferred machinery to Omega-Reed GmbH (Omega), a no-asset corporation owned by one of Günther's former employees, in exchange for Omega's promise to produce switches for Günther at a reduced cost and for a promise to pay in the future.  Despite Omega's tenuous financial condition, no security agreement was executed in connection with the transfer.  In an apparent effort to hide Günther's true financial condition, Günther's management originally reported a profit of DM 2,900,000 on the Omega transaction and booked the amount due as a receivable from Omega in Günther's books and records for FYE April 30, 1992.[11]  Any profit, however, was contingent upon the receipt and sale of Omega products to Günther's customers over a multiyear period, and thus was extremely speculative.

After petitioner discovered the Omega transaction in July 1992, Flint's president, Paul K. Lackey, Jr., dispatched senior management to Germany immediately, and Mr. Lackey soon followed.

---

[11]The alleged profit was backed out and recharacterized in Günther's commercial report for FYE April 30, 1992, and litigation was filed to recover the machinery.  Although Günther eventually recovered at least some of its machinery, the machinery had been stripped of its operating controls and essentially was worthless by the time the machinery was recovered.

Petitioner began to investigate Günther's financial condition and discovered that Günther's management had concealed the magnitude of Günther's operating losses by capitalizing expenses into phony inventory, incorrectly accounting for inventory, and overstating receivables with Günther's subsidiaries.

On August 20, 1992, Mr. Lackey fired Albert because, among other reasons, petitioner had discovered that Albert had orchestrated the coverup. For a short time after Albert was fired, Kampfrad acted as geschäftsführer, but, as Mr. Lackey suspected that Kampfrad had been involved in the coverup, Mr. Lackey eventually dismissed him as well.

B. <u>Günther's True Financial Condition as of FYE April 30, 1992</u>

In addition to the investigation by petitioner's management discussed above, Günther's German auditors conducted an audit in connection with the preparation of Günther's commercial report for its FYE 1992. Petitioner's investigation revealed that Günther's liabilities substantially exceeded the book value of its assets as of April 30, 1992, and that Günther was currently unable to pay its bank loans and other liabilities. The audit revealed that, for its FYE 1992, Günther had incurred a net loss from operations of DM 15,903,268 and that it had a "deficit not covered by equity" of DM 4,068,076, determined under German accounting standards.

C.  Bankruptcy Under German Law

Under German bankruptcy law, the geschäftsführer of a GmbH must file a bankruptcy proceeding, at the latest, within 3 weeks of the GmbH's becoming overindebted or insolvent.[12]  For purposes of German bankruptcy law, a GmbH is overindebted when its liabilities exceed its assets, and it is insolvent when it cannot pay its immediately due debts on a permanent basis for the foreseeable future.

A GmbH's bankruptcy allows its creditors to accelerate the debts owed to each creditor and to pursue collection of guaranteed debt from the guarantors.  In addition, a creditor of an overindebted or insolvent GmbH is authorized to file for the GmbH's bankruptcy.

If a shareholder of a bankrupt GmbH has made loans to, or assumed other liabilities of, a bankrupt GmbH, including payments of guaranteed debt, and the German bankruptcy court determines that such loans, assumptions, or payments were made at a time when the GmbH was overindebted or insolvent, the bankruptcy court can deny the shareholder repayment of such amounts.  Within 1 year after bankruptcy proceedings are opened, the administrator may challenge (1) any transaction by the bankrupt GmbH prejudicing creditors that occurred within 6 months of the beginning of the bankruptcy proceeding, if such transaction

---

[12]Failure to do so is a criminal offense under German law.

occurred while the GmbH was overindebted or insolvent, or within 10 days prior to the GmbH's becoming overindebted or insolvent, and the other party to the transaction knew of such overindebtedness or insolvency, and (2) any transaction by the GmbH, regardless of when such transaction occurred, the purpose or intent of which was to prejudice creditors, if such transaction occurred at a time reasonably connected to a subsequent bankruptcy.

In order to avoid bankruptcy under German law, the owners of a GmbH are required to endorse a plan aimed at improving the GmbH's financial stability as determined under applicable German accounting principles.

D.  Petitioner's Evaluation of Günther's Financial Condition

Faced with Günther's catastrophic net loss for FYE April 30, 1992, petitioner's management considered its options with respect to Günther.  It ascertained the fair market value of Günther's assets, looking for any asset whose fair market value so exceeded its book value that the asset might be converted into cash to pay down bank loans Flint had guaranteed.  It attempted to identify any liabilities not reflected on Günther's books that could arise if Günther were sold or liquidated or if Günther were forced into bankruptcy.  Most importantly, petitioner analyzed available options in order to ascertain which option would result in the smallest financial loss to petitioner from Günther's financial

collapse. As a result of this analysis, petitioner's management concluded that the option most likely to minimize petitioner's losses with respect to Günther was to prevent Günther's bankruptcy and any default on Günther's bank loans while petitioner paid down the guaranteed bank loans and attempted to find a purchaser for Günther.

Once petitioner's management concluded that Günther was no longer a viable going concern, that Günther must be sold or otherwise disposed of, and that its disposal would generate a loss, it presented its plan to petitioner's board of directors. On September 3, 1992, petitioner's board of directors approved the plan to dispose of Günther, and petitioner adopted discontinued operations treatment with respect to Günther's operations in preparing petitioner's consolidated financial statements as of May 31, 1992.

E. Discontinued Operations Treatment

Petitioner has prepared its consolidated financial statement in accordance with U.S. Generally Accepted Accounting Principles (U.S. GAAP) since 1981. U.S. GAAP requires a company to treat a business segment or unit as a discontinued operation when the company makes a decision to dispose of the business segment or unit and management expects to incur a loss on the disposal.

When a company adopts discontinued operations treatment with respect to a business unit, U.S. GAAP requires management to

assess the period of time operations will continue until disposal and the expected results of operations over that time period. U.S. GAAP also requires management to evaluate the expected outcome from the disposal of the business unit.  In order to do so, management is required to adjust the value of the unit's assets from book value to net realizable value.[13]

After conducting a review of Günther's assets and obtaining appraisals where necessary, petitioner's management concluded: (1) The values of most of Günther's book assets must be adjusted downward to reflect that their net realizable values were lower than their book values; (2) the value of Günther's ownership interest in Actium must be adjusted upward to reflect its net realizable value in excess of book value; and (3) Günther's liabilities substantially exceeded the fair market value of Günther's assets as of May 31, 1992.

On its consolidated statement of operations and retained earnings for FYE May 31, 1992, petitioner reported a loss from

---

[13]For Federal estate, gift, and income tax purposes, fair market value means "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 220 (1998).  Although net realizable value is an accounting concept which apparently refers to the net value realizable from the sale or disposition of a business unit and/or its assets and is not necessarily the same as fair market value, we are satisfied that petitioner's management calculated the fair market value of Günther's assets and that those values were considered in determining the net realizable value of Günther's assets for financial statement purposes.

discontinued operations, attributable to Günther, of $13,496,553 before income taxes. After reducing the loss for an income tax benefit of $4,229,613, petitioner reported a net loss attributable to Günther of $9,266,940. On its consolidated balance sheet for FYE May 31, 1992, petitioner reported a net liability from discontinued operations attributable to Günther of $10,502,000, consisting of a projected loss during the phaseout period of $3,883,000 and a projected loss on the final sale of Günther's assets of $6,619,000.

F. The Intercompany Account

Flint and its subsidiaries used an intercompany account to record various charges and credits among the different companies. Intercompany account balances were recorded in the books and records of the companies as accounts receivable/payable and accrued interest at a market rate.

Günther's intercompany account balance during the years at issue consisted of the following components: (a) Corporate charges; (b) interest charges; (c) allocations of expenses incurred on a group basis for Flint and its subsidiaries; e.g., insurance; (d) intercompany purchases; and (e) cash advances; i.e., cash paid directly to banks or advanced to Günther for that purpose and cash advanced to Günther for the purpose of meeting other short-term financial obligations, such as payroll. The following table shows Günther's intercompany account balances for

the FYE May 31, 1981-94,[14] the composition of Günther's
intercompany account balances for the FYE May 31, 1991-94, the
amount of Günther's bank loans assumed by petitioner during FYE
May 31, 1994, and certain waivers of intercompany account
balances discussed, infra.

| Fiscal year | Corporate charge | Interest charge | Group expense allocation | Interco. purchases | Cash advances | Balance owed by (to) Günther before waivers | Waivers of Interco. balance | Balance owed by (to) Günther after waivers | Bank debt assumption |
|---|---|---|---|---|---|---|---|---|---|
| 1981 | --- | --- | --- | --- | --- | $836,430 | --- | --- | --- |
| 1982 | --- | --- | --- | --- | --- | 1,476,550 | --- | --- | --- |
| 1983 | --- | --- | --- | --- | --- | 1,129,649 | --- | --- | --- |
| 1984 | --- | --- | --- | --- | --- | 747,695 | --- | --- | --- |
| 1985 | --- | --- | --- | --- | --- | 31,830 | --- | --- | --- |
| 1986 | --- | --- | --- | --- | --- | (9,787) | --- | --- | --- |
| 1987 | --- | --- | --- | --- | --- | (431,874) | --- | --- | --- |
| 1988 | --- | --- | --- | --- | --- | (104,906) | --- | --- | --- |
| 1989 | --- | --- | --- | --- | --- | 434,349 | --- | --- | --- |
| 1990 | --- | --- | --- | --- | --- | (91,019) | --- | --- | --- |
| 1991 | $180,000 | $36,992 | $130,327 | $341,436 | $650,000 | 1,247,736 | --- | --- | --- |
| 1992 | 180,000 | 275,006 | 26,178 | 564,736 | 4,270,468 | 6,564,124 | --- | --- | --- |
| 1993 | 180,000 | 184,366 | 51,792 | --- | 2,834,823 | 9,815,105 | ($9,000,000) | $815,105 | --- |
| 1994 | 50,000 | 58,635 | 23,570 | --- | 2,243,583 | 3,190,893 | (2,429,665) | 761,228 | $3,709,460 |

Günther made no payments on its intercompany account balance
during FYE May 31, 1992, 1993, or 1994.  Petitioner did not
expect advances it made to Günther or on Günther's behalf during
FYE May 31, 1992, 1993, and 1994 to be repaid.

---

[14]The record does not reflect the specific charges before
FYE May 31, 1991.

G.  Petitioner's Plan To Dispose of Günther

Günther's financial condition as of May 31, 1992, was so bad that petitioner could have forced Günther to file for bankruptcy simply by withholding additional financial support.  Petitioner discussed bankruptcy but decided to pursue an orderly disposition of Günther to minimize petitioner's losses from Günther's financial collapse and to avoid triggering contingent and/or potential liabilities, which did not appear on Günther's balance sheet.  The plan included making payments on the guaranteed bank loans to prevent Günther's default until a purchaser could be found, shoring up Günther's German balance sheet by waiving petitioner's right to collect a portion of Günther's intercompany account balance, and minimizing petitioner's exposure on the lease guaranty by purchasing Günther's interest in Actium.

1.  The First Waiver Subject to Reinstatement

Under German GmbH law, a formal contribution to the capital of a GmbH by its owner requires an amendment to the GmbH's charter, which must be effected in accordance with German GmbH law.  An informal contribution to a German GmbH, however, does not require a charter amendment.  One type of informal shareholder financing available to a German GmbH is a waiver of a shareholder's loan to the GmbH.

A waiver of a shareholder's loan subject to reinstatement is a form of contingent debt that can return a subsidiary GmbH to

technical solvency for German law purposes.  A waiver of a
shareholder's loan to a GmbH can be made subject to the condition
that the loan will be reinstated as soon as the financial
condition of the subsidiary GmbH has improved to permit repayment
out of surplus capital.  When a waiver subject to reinstatement
is given, interest for the period of time during which the loan
had been waived can be imposed upon the subsidiary GmbH.

As part of its plan to dispose of Günther and in order to
forestall the filing of a bankruptcy proceeding with respect to
Günther, petitioner waived portions of Günther's intercompany
account balance.

The first waiver, executed on October 1, 1992, involved
several steps.  First, Flint assigned $9 million of Günther's
intercompany account balance to Flint Electronics.  Next, Flint
Electronics formally waived the receivable "In order to create a
sound financial basis for future operations * * * and to
recapitalize Günther".  The waiver was subject to the condition
that "at such time that the net equity of Günther exceeds its
registered capital * * * the waived amount will * * * [at Flint
Electronic's option] be owed by Günther again".  Flint
Electronics recorded the waived intercompany receivable as
contributed capital.  This first waiver effectively reclassified
$9 million of the intercompany account payable on Günther's books

as equity, thereby enabling Günther to issue its FYE April 30, 1992, commercial report and avoid statutory bankruptcy.[15]

## 2. The Actium Transaction

The next part of petitioner's plan to minimize its exposure involved the purchase of Günther's interest in Actium. Unlike virtually every other asset on Günther's German balance sheet, the fair market value of Günther's partnership interest in Actium exceeded its book value. Petitioner concluded that if Günther were to sell its interest in Actium to an affiliated company, the resulting net cashflow could be used to pay down Günther's liabilities, while minimizing petitioner's potential exposure in the event of Günther's bankruptcy.

Petitioner organized a subsidiary, Investors Capital Company (ICC), which purchased Günther's ownership interest in Actium in December 1992 for its fair market value of approximately $3,477,000. The fair market value of Günther's interest in Actium was determined by an independent third-party appraisal because petitioner was concerned that the transaction could be reversed in bankruptcy. The purchase yielded a positive cashflow to Günther of DM 8,000,000.[16]

_____

[15]Günther's auditors would not issue financial statements for FYE Apr. 30, 1992, that showed liabilities in excess of assets, one of the conditions resulting in statutory bankruptcy.

[16]The return of a related sinking fund and an amount attributable to tenant improvements increased the funds available to pay down Günther's liabilities from approximately DM 5,400,000

(continued...)

To ensure that all of Günther's creditors benefited from the Actium sale, Flint directed Günther to use 80 percent of the cash generated by the Actium sale to pay down Günther's guaranteed bank loans in proportion to their balances.  The remaining cash was used to pay employee salaries, trade creditors, and tenant improvements.  None of the sale proceeds were used to repay any part of the intercompany account balance owed by Günther to petitioner.

H.  Petitioner's Efforts To Dispose of Günther

Throughout the period following discovery of the Omega transaction and dismissal of Günther's management, petitioner continued Günther's operations while seeking potential purchasers for Günther and its product lines.  Petitioner retained investment banks and brokers, but there was very little interest in Günther.  Before the purchase of Günther by Günther America, Inc. (GAI), during FYE May 31, 1994, discussed infra, only one offer to purchase Günther was received.  In March 1993, Celduc, one of Günther's principal competitors, offered to purchase Günther, if petitioner contributed cash of DM 20 million (approximately $12,050,000) and made guaranties and concessions worth several million dollars more.  After unsuccessful efforts to negotiate a more favorable deal, petitioner ultimately

---

[16](...continued)
to approximately DM 8 million.

rejected Celduc's offer and continued to seek other potential purchasers.

Generally, from July 1992 forward, one of petitioner's board members or corporate officers was onsite in Germany to supervise Günther's management and keep petitioner informed of developments. Despite petitioner's supervision, Günther continued to report operating losses in FYE April 30, 1993 and 1994.

In March 1993, petitioner hired Elson Nowell as geschäftsführer. Upon becoming geschäftsführer, Mr. Nowell discovered that Günther had inflated the value of its inventory by cycling old inventory through its subsidiaries.[17] This discovery necessitated additional substantial writeoffs in connection with the preparation of Günther's commercial report for its FYE April 30, 1993.

On January 21, 1994, in order to make Günther more appealing to potential purchasers, petitioner arranged an additional waiver of Günther's intercompany receivable. Flint assigned $2,429,665 of its intercompany receivable to Flint Electronics, which then waived the receivable, subject to reinstatement. This second waiver was identical in all practical aspects to the first

---

[17]Under accounting principles applicable to an electronics firm such as Günther, older inventory is written down to progressively lower values to account for its obsolescence and reduced market value. Günther avoided this writedown by transferring assets among the subsidiaries.

waiver, and was made "to create a sound financial basis for future operations * * * and to recapitalize Günther."

Sometime between January and April 1994, petitioner finally found a purchaser for Günther. Robert P. Romano, an individual who had worked for one of Flint's other electronics subsidiaries and had started an electronics company of his own, agreed to purchase Günther through GAI, a corporation formed to acquire Günther.

Under the terms of a sale agreement dated April 13, 1994, GAI gave Flint Electronics a promissory note for DM 5,000,000, Flint assumed all of Günther's remaining bank debt ($3,709,460) and forgave the remaining intercompany receivable balance ($761,228), and Flint Electronics relinquished its right to reinstate the waived intercompany receivable ($11,429,665). GAI's promissory note provided for minimum principal and interest payments beginning in FYE May 31, 1996, and specified that the payment schedule would accelerate if GAI sold assets other than in the ordinary course of business or became profitable. Petitioner bargained for the note to discourage GAI from liquidating Günther.

GAI retained Mr. Nowell as geschäftsführer. In the years following the sale of Günther, the company reported a small operating loss followed by marginal profits. In 1996, the first year payment under the promissory note became due, GAI/Günther

paid approximately DM 125,000 to one of Flint's subsidiaries pursuant to the promissory note.

VIII.  Günther's Value as of May 31, 1992

As of May 31, 1992, Günther's liabilities (excluding the intercompany account payable of $6,564,124 owed to Flint and the reserve for Günther's projected FYE April 30, 1993, operating loss of $3.2 million) exceeded the fair market value of its assets by at least $7 million.  As of May 31, 1992, and for the foreseeable future, Günther was unable to pay its guaranteed bank loans and other obligations when due.

IX.  Deductions Claimed

For FYE May 31, 1992, petitioner claimed a worthless stock deduction of $7,374,438 (petitioner's adjusted basis in Günther's stock without regard to our discussion herein) under section 165 and a bad debt deduction of $6,564,124 (the intercompany account balance as of May 31, 1992) under section 166.

For FYE May 31, 1993, petitioner claimed an additional worthless stock deduction of $2,435,876 and a bad debt deduction of $815,105.  The worthless stock deduction equaled the amount of the first waiver subject to reinstatement, less the amount claimed as a bad debt deduction on petitioner's FYE 1992 return. The bad debt deduction equaled the intercompany account balance as of May 31, 1993.

For FYE May 31, 1994, petitioner reduced its income by $6,085,248.[18] This amount consisted of the ending balance of Günther's intercompany account as of May 31, 1994, that had not yet been written off for Federal income tax purposes ($2,375,788) and the amount of Günther's guaranteed bank loans petitioner assumed ($3,709,460).

X. Notice of Deficiency

In the notice of deficiency, respondent disallowed petitioner's deductions for bad debts and worthless stock attributable to Günther that were claimed for FYE May 31, 1992 and 1993, increased petitioner's income for FYE May 31, 1994, and reduced petitioner's net operating losses for FYE 1992, 1993, and 1994, accordingly. Respondent recharacterized the disallowed deductions as long-term capital losses and recomputed the net operating loss carrybacks allowable for FYE 1989, 1990, 1991, and 1992. Respondent also determined that other adjustments were required, which have since been resolved by agreement or are computational.

---

[18]In the notice of deficiency, respondent proposed an adjustment increasing petitioner's income by $6,085,248. For briefing and argument purposes, however, the parties have treated the disputed adjustment as the disallowance of a bad debt deduction.

OPINION

I.  Bad Debt Deductions

Section 166 authorizes a taxpayer to deduct any debt that becomes worthless within the taxable year.  Nonbusiness bad debts are treated as losses resulting from the sale or exchange of a short-term capital asset.  Secs. 166(d)(1), 1211(b), 1212(b). Business bad debts are deductible as ordinary losses to the extent of the taxpayer's adjusted basis in the debt.  Sec. 166(b).

In order for petitioner to prevail on the bad debt issue, petitioner must first establish that:  (1) A bona fide debt existed between petitioner and Günther which obligated Günther, the alleged debtor, to pay petitioner a fixed or determinable sum of money; (2) the debt was created or acquired in, or in connection with, petitioner's trade or business; and (3) the debt became worthless in the year the bad debt deduction was claimed. Sec. 166; United States v. Generes, 405 U.S. 93 (1972); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 284-285 (1990); Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Black v. Commissioner, 52 T.C. 147, 151 (1969).  A gift or contribution to capital is not debt within the meaning of section 166.  Calumet Indus., Inc. v. Commissioner, supra at 284; Kean v. Commissioner, 91 T.C. 575, 594 (1988).  Petitioner bears the burden of proving that it is

entitled to a business bad debt deduction under section 166. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[19]

Petitioner contends it properly deducted the intercompany account balances owed to it by Günther as business bad debts under section 166. Respondent disagrees, contending that the amounts constituting the intercompany account balances (hereinafter collectively referred to as advances) were contributions to the capital of Günther and that, even if the advances qualify as bona fide debt, the debts were not worthless in the years the deductions were claimed.

A. <u>Were the Advances Made to Günther and Charged to the Intercompany Account Bona Fide Debt?</u>

1. <u>In General</u>

In order for us to find that a bona fide debt was created for purposes of section 166, petitioner must prove that there was "a genuine intention to create a debt, with a reasonable expectation of repayment" and that the intention was consistent with the "economic reality of creating a debtor-creditor relationship". <u>Litton Bus. Sys., Inc. v. Commissioner</u>, 61 T.C. 367, 377 (1973). Whether the requisite intention to create a true debtor-creditor relationship existed is a question of fact to be determined from a review of all the evidence. <u>Id.</u> Factors

---

[19]The burden of proof provisions of sec. 7491 do not apply here because the examination in this case began before July 22, 1998. See Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726.

we ordinarily consider in our analysis include, but are not limited to:  (1) The name given to the certificate evidencing the indebtedness, (2) the presence or absence of a fixed maturity date, (3) the source of payments, (4) the right to enforce repayment, (5) any increase in management participation as a result of the advances, (6) the status of the advances in relation to debts owed to regular corporate creditors, (7) the intent of the parties, (8) thin or adequate capitalization, (9) the identity of interest between creditor and stockholder, (10) payment of interest only out of profits, (11) the ability to obtain loans from outside lending institutions, (12) the extent to which the advance was used to acquire capital assets, and (13) the failure of the corporation to repay on the due date.  Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 602-606 (1991); see also Calumet Indus., Inc. v. Commissioner, supra at 285; Anchor Natl. Life Ins. Co. v. Commissioner, 93 T.C. 382, 400 (1989) (11 factors); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980) (13 factors).  No single factor is determinative, and not all factors are applicable in each case.  Dixie Dairies Corp. v. Commissioner, supra at 493-494.  "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor

relationship." Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968).

Before we apply the factors, however, we must first identify the relevant date that governs our analysis. Ordinarily we must examine an advance as of the date it is made to decide whether it qualifies as bona fide debt. When an advance takes the form of a payment required by a guaranty, however, we must examine the circumstances existing on the date the guaranty is given. Sec. 1.166-9(c), Income Tax Regs. Petitioner contends that we must divide the amounts recorded in the intercompany account into two categories--amounts reducing Günther's guaranteed bank loan balances and amounts paid on other obligations. Petitioner asserts that all amounts paid towards the bank loans were payments required by Flint's guaranties and must be analyzed as of the dates of the guaranties. Respondent contends that none of the payments applied to Günther's bank loans were payments that Flint was required to make under its guaranties, and that all of the advances, including those applied to the guaranteed bank loans, must therefore be analyzed as of the dates the payments were made.

Petitioner did not prove that any of the banks declared a default on any of Günther's guaranteed bank loans or demanded that petitioner pay under the guaranties, or that petitioner actually made guaranty payments and, if so, in what amount. We

conclude, therefore, that because petitioner has failed to prove that any of the payments charged to the intercompany account were guaranty payments, for purposes of our analysis under section 166 we must evaluate all of the advances constituting Günther's intercompany account balance as of the years the advances were paid and recorded in the intercompany account.

### 2. Applying the Factors

We proceed to examine the advances under the traditional multifactor approach. Cf. Hayutin v. Commissioner, 508 F.2d 462, 472-474 (10th Cir. 1974), affg. T.C. Memo. 1972-127. Respondent's determination as to whether a shareholder's advance is debt or equity is presumed to be correct. Gooding Amusement Co. v. Commissioner, 23 T.C. 408, 421 (1954), affd. 236 F.2d 159 (6th Cir. 1956).

### a. Name Given to Certificate

The advances in question were not memorialized by any promissory note or other documentation characterizing the advances as debt. Consequently, both parties agree that this factor is not relevant to our analysis.

### b. Presence or Absence of Fixed Maturity Date

"The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation. The absence of the same on the other hand would indicate that repayment was in some way tied to the fortunes of the business,

indicative of an equity advance." Estate of Mixon v. United States, 464 F.2d 394, 404 (5th Cir. 1972); see also sec. 385(b)(1); Am. Offshore, Inc. v. Commissioner, supra at 602. Evidence that a creditor did not intend to enforce payment or was indifferent as to the exact time the advance was to be repaid belies an arm's-length debtor-creditor relationship. See generally Gooding Amusement Co. v. Commissioner, supra at 418-421.

Petitioner acknowledges that there was no fixed date for Günther's repayment of petitioner's advances but argues that the history of repayment before FYE May 31, 1991, demonstrates that a fixed repayment schedule was unnecessary. Petitioner also contends, but did not prove, that all members of the consolidated group used the intercompany account in the same manner, and, thus, this factor should not favor equity.

The record in this case establishes that the intercompany account was an open account with a running balance and no fixed date for repayment. While Flint and its subsidiaries may have used the account in a similar fashion, any similarity in usage does not change the fact that petitioner did not prove there was any deadline for repayment of balances owed among the companies.

This factor favors respondent's position.

c. Source of the Payments

If the source of the debtor's repayment is contingent upon earnings or is from a restricted source, such as a judgment recovery, dividends, or profits, an equity investment is indicated. Estate of Mixon v. United States, supra at 405; Calumet Indus., Inc. v. Commissioner, 95 T.C. at 287-288; Dixie Dairies Corp. v. Commissioner, 74 T.C. at 495. In such a case, the lender acts "'as a classic capital investor hoping to make a profit, not as a creditor expecting to be repaid regardless of the company's success or failure.'" Calumet Indus., Inc. v. Commissioner, supra at 287-288 (quoting In re Larson, 862 F.2d 112, 117 (7th Cir. 1988)). When circumstances make it impossible to estimate when an advance will be repaid because repayment is contingent upon future profits or repayment is subject to a condition precedent, or where a condition may terminate or suspend the obligation to repay, an equity investment is indicated. Affiliated Research, Inc. v. United States, 173 Ct. Cl. 338, 351 F.2d 646, 648 (1965).

Petitioner acknowledges that repayment of the advances was dependent upon Günther's earnings. Therefore, the only question is the weight to be given this factor. We conclude that this factor favors respondent's position and that it is entitled to considerable weight because Günther had no available source of repayment other than its earnings and, during the years the

advances were made, petitioner knew there was very little, if any, possibility that the advances would ever be repaid.[20]

### d. The Right To Enforce Repayment

A right to enforce the repayment of amounts advanced to another, which is conferred on the entity making the advances, is indicative of bona fide debt. Estate of Mixon v. United States, supra at 405; Am. Offshore, Inc. v. Commissioner, 97 T.C. at 603. Petitioner failed to introduce any evidence regarding the operation of the intercompany account in FYE May 31, 1991,[21] and thereafter or the terms applicable to any account balance, other than with respect to interest. Because petitioner bears the burden of proof, petitioner's failure to introduce evidence regarding this factor weighs against petitioner's position.

### e. Increase in Management Participation

If a creditor receives a right to participate in the management of a business in consideration for an advance to the business, such participation tends to demonstrate that the advance was not a bona fide debt but rather was an equity investment. Am. Offshore, Inc. v. Commissioner, supra at 603.

---

[20]Even the advances made during FYE May 31, 1991, were made at a time when Günther had suffered a downturn in its business, and repayment was dependent on earnings.

[21]The intercompany account balance owed by Günther as of May 31, 1992, consisted, in part, of amounts advanced during FYE May 31, 1991. Unless otherwise noted, our analysis covers advances in FYE May 31, 1991, as well as those in later years.

Before petitioner learned of Günther's dire financial condition, Günther's local management ran its day-to-day operations with oversight from petitioner. After petitioner learned of Günther's financial problems, petitioner's management became more actively involved in Günther's operations, eventually assuming direct control. Although respondent argues that this factor favors equity, we reject the argument. Petitioner did not receive an increased role in Günther's management during FYE 1992, 1993, and 1994 in exchange for petitioner's advances; rather, petitioner's increased participation in management was a necessary part of its effort to prevent Günther's financial collapse from becoming public. This factor is neutral.

### f. Status Equal or Inferior to Other Creditors

Whether an advance is subordinated to regular creditors bears on whether the taxpayer was acting as a creditor or an investor. Estate of Mixon v. United States, supra at 406. In addition, "Failure to demand timely repayment effectively subordinates the intercompany debt to the rights of other creditors who receive payment in the interim." Am. Offshore, Inc. v. Commissioner, supra at 603 (citing Inductotherm Indus., Inc. v. Commissioner, T.C. Memo. 1984-281, affd. without published opinion 770 F.2d 1071 (3d Cir. 1985)).

Petitioner effectively subordinated its intercompany advances to Günther for the benefit of third-party creditors in

two ways.  First, petitioner caused Günther to distribute the net proceeds from the Actium transaction as part payment to the banks and trade creditors to whom Günther was liable, but no part of the proceeds was used to repay the intercompany account balance. Second, when petitioner waived portions of Günther's intercompany account balance, it effectively subordinated the intercompany account balance to other creditors.

Subordination of the advances strongly indicates equity. This factor favors respondent's position.

### g.   Intent of the Parties

"[T]he inquiry of a court in resolving the debt-equity issue is primarily directed at ascertaining the intent of the parties". A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970) (citing Taft v. Commissioner, 314 F.2d 620 (9th Cir. 1963), affg. in part and revg. in part T.C. Memo. 1961-230).  Before the waivers of portions of the intercompany account balance owed to petitioner by Günther, both companies treated the intercompany account balance as debt in that the outstanding account balance accrued interest.  The intercompany account balance was recorded as an account payable by Günther and an account receivable by petitioner on their respective financial statements.

Although petitioner treated the intercompany account balance as debt on its books and records and referred to the account balance as a debt owed to it by Günther, it is obvious that

neither petitioner nor Günther intended, or reasonably could have intended, the advances[22] to be bona fide debt. Petitioner made the advances to keep Günther from defaulting on its bank loans and other obligations. During FYE May 31, 1991 and 1992, petitioner knew the advances were risky but made them anyway. During FYE May 31, 1993 and 1994, petitioner realized that it would not recover any of the amounts it had advanced to Günther or for Günther's benefit, and it continued to inject funds into Günther for the sole purpose of minimizing the losses it would incur before Günther's disposal. We conclude, therefore, that neither petitioner nor Günther genuinely intended the advances to be bona fide debt or reasonably expected the advances to be repaid. See Sigmon v. Commissioner, T.C. Memo. 1988-377.

This factor favors respondent's position.

h. <u>Thin or Adequate Capitalization</u>

Inadequate or "thin" capitalization is strong evidence of a capital contribution where: (1) The debt-to-equity ratio was initially high; (2) the parties realized that it would likely go higher; and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations. <u>Am. Offshore, Inc. v. Commissioner</u>, <u>supra</u>

---

[22]Even the advances charged to the intercompany account during FYE May 31, 1991, were made to prevent a default on Günther's bank loans and to provide working capital.

at 604 (citing United States v. Henderson, 375 F.2d 36, 40 (5th Cir. 1967)).

In its reply brief, petitioner maintains that Günther had a debt-to-equity ratio of 3.4:1 as of May 31, 1991.[23] Petitioner did not explain precisely how it calculated the debt-to-equity ratio, nor did petitioner present any argument regarding the proper method for calculating the ratio.[24] Petitioner also failed to explain why the debt-to-equity ratio it calculated as of May 31, 1991, supported its position that Günther was adequately capitalized during each of the taxable years at issue here.

The failures identified above, combined with our review of evidence in the record, lead us to conclude petitioner has failed to prove that the capitalization of Günther was adequate to meet its reasonably foreseeable business needs. There is certainly ample evidence in the record from which an inference can be drawn that Günther's capitalization was inadequate. Petitioner's large

---

[23]Petitioner apparently calculated the ratio by dividing Günther's total long-term liabilities of $4,782,637 as of May 31, 1991, by total stockholder's investment of $1,405,422. Petitioner's method of calculating the debt-to-equity ratio ignores approximately 80 percent of the total liabilities outstanding as of May 31, 1991, and determines Günther's equity based upon the book value of Günther's assets.

[24]For example, in some cases, courts, including this Court, have used the fair market values of assets rather than their book values to calculate debt-to-equity ratios. E.g., Kraft Foods Co. v. Commissioner, 232 F.2d 118 (2d Cir. 1956), revg. 21 T.C. 513 (1954); Mason-Dixon Sand & Gravel Co. v. Commissioner, T.C. Memo. 1961-259.

cash infusions and Günther's poor relationship with German banks suggest inadequate capitalization.  Although petitioner's capital contributions to Günther in FYE May 31, 1985 and 1992, were substantial, they were insufficient to staunch the flow of red ink caused by Günther's negative cashflow.

For all relevant time periods, therefore, we conclude that this factor favors respondent's position.

### i.   The Identity of Interest Between Creditor and Shareholder

At all relevant times, a member of the consolidated group was Günther's sole shareholder.  Advances made by a sole shareholder are more likely to be committed to the risk of the business (and hence indicative of an equity investment) than are advances made by creditors who are not shareholders of the corporation.  Ga. Pac. Corp. v. Commissioner, 63 T.C. 790, 797 (1975).  The sole shareholder is also less likely to be concerned than a third party would be with the safeguards normally used to protect such advances.  Id.  Petitioner's status as sole shareholder obviously leads to an identity of interest which, respondent argues, strongly indicates an equity investment. Petitioner argues that its greater involvement in Günther's day-to-day management after Günther's financial difficulties became apparent shows that it was more interested in protecting its interests as a creditor; i.e., its focus was on minimizing its

liability under the guaranties and not on protecting its equity investment in Günther.

The record in this case establishes that there was an identity of interest between petitioner's role as creditor and as shareholder. This factor favors respondent's position.

j. Payment of Interest Only Out of Profits

This factor is essentially the same as the third factor, the source of the payments. Hardman v. United States, 827 F.2d 1409, 1414 (9th Cir. 1987). It focuses, however, on how the parties to the advances treated interest. As we have stated, "A true lender is concerned with interest." Id. at 605 (citing Estate of Mixon v. United States, 464 F.2d at 409). The failure to insist on interest payments indicates that the payors expect to be paid out of future earnings or through the increased market value of their equity interest. Am. Offshore, Inc. v. Commissioner, supra at 605 (citing Curry v. United States, 396 F.2d 630, 634 (5th Cir. 1968)).

Although the intercompany account balance accrued interest, which was added to the yearend account balance reflected in the books and records of both petitioner and Günther, Günther did not, and financially could not, make any interest payments during FYE May 31, 1992, 1993, or 1994. Payment of the accrued interest was entirely dependent on profits that Günther did not have and

was not likely to have in the future.  On balance, this factor favors respondent's position.

### k.  Ability of Günther To Obtain Funds From Outside Lending Institutions

"[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms."  Segel v. Commissioner, 89 T.C. 816, 828 (1987) (citing Scriptomatic, Inc. v. United States, 555 F.2d 364, 367 (3d Cir. 1977)); see also Calumet Indus., Inc. v. Commissioner, 95 T.C. at 287.

The record contains only vague and limited information on Günther's financial status before FYE May 31, 1992, and no evidence tending to prove that Günther could have obtained comparable loans from unrelated financial institutions.  The limited evidence regarding Günther's financial condition before FYE May 31, 1992, tends to show that Günther was not in a position to obtain substantial funding from any financial institution without meaningful security, guaranties from a third party, and fixed payment terms.  Petitioner's financial support of Günther through the mechanism of the intercompany account had none of these characteristics and was far more speculative.  See Fin Hay Realty Co. v. United States, 398 F.2d at 697; Dixie Dairies Corp. v. Commissioner, 74 T.C. at 497.

This factor favors respondent's position.

l. The Extent To Which the Advances Were Used
To Acquire Capital Assets

Respondent concedes that the advances to Günther were used primarily to service existing bank loans and that, therefore, this factor is not relevant.

m. Failure To Repay on the Due Date

Petitioner's advances to Günther were made pursuant to an open account arrangement with no fixed date for repayment. Consequently, this factor is not relevant to our analysis.

3. Conclusion

Upon consideration of the above factors, we hold that Günther's intercompany account balance during and after FYE May 31, 1992, was not a bona fide debt within the meaning of section 166[25] and that petitioner is not entitled to the bad debt deductions it claimed under section 166. We treat the advances recorded in the intercompany account, instead, as capital contributions, which created basis in Günther's stock. Datamation Servs., Inc. v. Commissioner, T.C. Memo. 1976-252.

B. Guaranteed Bank Loan Assumed by Petitioner in 1994

For FYE May 31, 1994, petitioner claimed the equivalent of a bad debt deduction for the guaranteed bank debt assumed as part of GAI's acquisition of Günther. Petitioner argues that, because it was an accrual basis taxpayer entitled to a deduction when all

_____

[25]Our holding eliminates the need to discuss the remaining requirements of sec. 166.

events that fix the liability have occurred and the amount of the liability can be determined with reasonable accuracy, its assumption of liability for Günther's bank loans it had guaranteed should give rise to an immediate deduction. We disagree. A taxpayer's assumption of liability for guaranteed bank debt does not give rise to an immediate deduction, even when the taxpayer utilizes the accrual method of accounting and even when there is no right of subrogation or the right of subrogation is worthless.[26] Black Gold Energy Corp. v. Commissioner, 99 T.C. 482 (1992), affd. without published opinion 33 F.3d 62 (10th Cir. 1994). Rather, the event giving rise to a deduction is the taxpayer's payment of the liability. Id. at 488.

The record in this case establishes only that Flint assumed liability for Günther's guaranteed bank loans during FYE May 31, 1994. Petitioner introduced no evidence establishing how much, if any, of the bank loans Flint actually paid during FYE May 31, 1994, after it assumed liability for them. Consequently, we hold that petitioner has failed to prove it is entitled to a bad debt deduction equal to the amount of the guaranteed bank loans assumed during FYE May 31, 1994.

---

[26]The assumption of liability also does not create any basis until the obligation is paid. Sec. 1.166-9(c), Income Tax Regs.

II.  Worthless Stock Deductions

A.  Deduction Claimed on FYE May 31, 1992, Return

We now consider whether petitioner's shares of Günther's stock were worthless as of May 31, 1992.  Petitioner claimed a worthless stock deduction for FYE May 31, 1992, in an amount equal to its basis[27] in its Günther shares as of May 31, 1992. Petitioner asserts that it is entitled to the deduction under section 165 because the shares became worthless during FYE May 31, 1992.  Respondent asserts that petitioner has failed to prove its shares of Günther's stock became worthless.

---

[27]In both its opening and reply briefs, petitioner asserted it was entitled to claim an increased worthless stock deduction in the event we held that items constituting the intercompany account balance were capital contributions.  Respondent did not dispute that such capital contributions increased petitioner's basis; respondent contended only that Günther was not worthless.

Petitioner's adjusted basis in its Günther stock as of May 31, 1992, was $7,374,438 before any adjustment attributable to the bad debt issue.  Our conclusion that amounts constituting the intercompany account balance as of FYE May 31, 1992, 1993, and 1994 were contributions to Günther's capital when made means that petitioner's adjusted basis in Günther's stock as of May 31, 1992, must be increased by the intercompany account balance as of that date.  Petitioner's adjusted basis in Günther's stock as of May 31, 1992, recomputed in accordance with this opinion, was $13,938,562.  Our analysis of whether Günther's stock was worthless must take into account the increased equity and decreased liability resulting from our decision on the bad debt issue.  See Datamation Servs., Inc. v. Commissioner, T.C. Memo. 1976-252.

Section 165(g)[28] authorizes a domestic corporation owning

---

[28]Sec. 165(g) provides in pertinent part:

SEC. 165(g).  Worthless Securities.--

(1) General rule.--If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

(2) Security defined.--For purposes of this subsection, the term "security" means--

　　(A) a share of stock in a corporation;

　　(B) a right to subscribe for, or to receive, a share of stock in a corporation; or

　　(C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation * * *, with interest coupons or in registered form.

(3) Securities in affiliated corporation.--For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset.  * * * a corporation shall be treated as affiliated with the taxpayer only if--

　　(A) stock possessing at least 80 percent of the voting power of all classes of its stock and at least 80 percent of each class of its nonvoting stock is owned directly by the taxpayer, and

　　(B) more than 90 percent of the aggregate of its gross receipts for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the corporation in the ordinary course of its operating business), dividends, interest

(continued...)

stock of an affiliated domestic or foreign corporation[29] to claim an ordinary loss with respect to the affiliated corporation's stock that becomes wholly worthless during the taxable year. Sec. 165(g)(3); sec. 1.165-5(d)(1), Income Tax Regs.  A corporation claiming a worthless stock loss under section 165(g)(3) must prove that the stock in question had value at some point during the taxable year in which worthlessness is claimed but ceased to have both "liquidating value" and "potential value" by the end of that year.  Sec. 165(g)(1); Austin Co. v. Commissioner, 71 T.C. 955, 970 (1979); Steadman v. Commissioner, 50 T.C. 369, 376 (1968), affd. 424 F.2d 1 (6th Cir. 1970); Morton v. Commissioner, 38 B.T.A. 1270, 1278 (1938), affd. 112 F.2d 320 (7th Cir. 1940).  The standard we apply is whether a prudent businessperson would have considered the stock of the affiliated corporation to be worthless by the end of the taxable year for which a worthless stock loss under section 165 is claimed. Steadman v. Commissioner, supra.

-----

[28](...continued)
        (except interest received on deferred
        purchase price of operating assets sold),
        annuities, and gains from sales or exchanges
        of stocks and securities.

[29]For purposes of sec. 165, an affiliated corporation is one in which the taxpayer owns directly stock possessing at least 80 percent of the voting power of all classes of such corporation's stock and at least 80 percent of each class of such corporation's nonvoting stock.  Sec. 1.165-5(d)(2)(i)(a), Income Tax Regs.

1.  <u>Did Günther Have Value During FYE 1991?</u>

As shown in the consolidated report column of Günther's balance sheet as of May 31, 1991, Günther had a positive net worth of $1,405,422.  Respondent does not dispute that Günther had value during FYE May 31, 1992; it argues only that petitioner has failed to prove Günther was worthless on May 31, 1992.

2.  <u>Did Günther Lack Liquidation Value As of May 31, 1992?</u>

A corporation lacks liquidation value when its liabilities exceed the value of its assets.  <u>Steadman v. Commissioner</u>, <u>supra</u> at 376-377.  Following an investigation, petitioner concluded that Günther's liabilities substantially exceeded the aggregate fair market value of Günther's assets and that petitioner would receive nothing upon Günther's liquidation.[30]  In fact, petitioner has demonstrated to our satisfaction that its conclusion was accurate and that its management searched diligently for any of Günther's assets that had a fair market value in excess of book value which could be liquidated to pay down the guaranteed bank loans and mitigate petitioner's losses from its investment in Günther.

---

[30]Günther's consolidated balance sheet as of May 31, 1992, shows a deficit in shareholder's equity of $17,010,232.  Our conclusion that the intercompany advances were contributions to capital and not debt requires an adjustment in that figure, but, even after adjustment, Günther still had a substantial net deficit as of May 31, 1992.

Although respondent asserts that some value should be attributed to goodwill, patents, and other intangibles not shown on Günther's balance sheet, in our view the evidence showed that Günther had destroyed its goodwill with ongoing quality problems and that its patents had little or no value. We find nothing in the record to indicate that these assets had significant value, and much to indicate that they did not.

Respondent also argues that petitioner aggressively wrote down the values of Günther's assets to support its claims of worthlessness and that use of discontinued operations treatment was improper. Respondent urges us to rely instead on Günther's German commercial report for its FYE April 30, 1992, which was prepared on a going concern basis.

Petitioner responds that the writedowns jeopardized its own banking and surety relationships and thus threatened the existence of the parent company. Consequently, petitioner contends that it had a strong disincentive to overstate any writedowns. Petitioner further contends that its treatment of Günther as a discontinued operation was appropriate and that the resulting adjustment in the value of Günther's assets confirmed management's evaluation of the fair market value of those assets. Petitioner also argues that it was required to use U.S. GAAP by section 446(a) which states that a taxpayer shall compute taxable income "under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books."

We find no support in the record for respondent's allegations of unduly pessimistic valuation in connection with the discontinued operations writedowns.  Petitioner presented the expert testimony of Justin A. Gannon, an audit partner in the San Antonio office of Arthur Andersen LLP, on the propriety of adopting discontinued operations treatment with respect to Günther for FYE May 31, 1992.  Respondent stipulated that Mr. Gannon was an expert in the field of accounting.  Mr. Gannon's report sets forth the underlying facts in support of his conclusion that discontinued operations treatment was appropriate.  Respondent did not offer any expert testimony to rebut Mr. Gannon's testimony.  Our consideration of all the evidence in this case, including but not limited to Mr. Gannon's testimony, convinces us that petitioner's decision to adopt discontinued operations treatment was consistent with U.S. GAAP and appropriate under the circumstances herein.[31]  Moreover, petitioner has convinced us that its efforts with respect to Günther were directed to minimizing the substantial economic losses it reasonably anticipated from Günther's catastrophic financial implosion and were not structured to distort its tax position.

---

[31]We note that the value of Günther's interest in Actium was increased as a result of discontinued operations treatment.  This writeup belies respondent's claim that discontinued operations treatment was undertaken solely to buttress petitioner's claim that Günther had become worthless.

Respondent's reliance on Günther's German commercial report for its FYE April 30, 1992, is likewise unsupported. Petitioner has amply demonstrated that Günther's FYE April 30, 1992, commercial report used the book values of Günther's assets instead of fair market values and that it did not realistically present Günther's true financial condition or adequately state the value of petitioner's investment in Günther.

We hold that, because Günther's liabilities substantially exceeded the fair market value of its assets as of May 31, 1992, Günther lacked liquidation value as of May 31, 1992.

### 3. Did Günther Lack Potential Value as of May 31, 1992?

A corporation lacks potential value when there is no reasonable expectation that assets will exceed liabilities in the future. Steadman v. Commissioner, 50 T.C. at 376. Generally, a lack of potential value is established by showing that an identifiable event, such as bankruptcy, liquidation, the appointment of a receiver, or the cessation of normal business operations, effectively has destroyed the corporation's potential value. Id. at 376-377; Morton v. Commissioner, 38 B.T.A. at 1279. Where, however, a corporation's liabilities so greatly exceed the value of the corporation's assets and the corporation's assets and business are such that no reasonable expectation of profit to the shareholders exists, the inability of a taxpayer to point to an identifiable event as proof of a

lack of potential value is of no consequence.  Morton v. Commissioner, supra at 1279; see also Steadman v. Commissioner, supra at 377.

The record in this case leads us overwhelmingly to the conclusion that Günther had no potential value as of May 31, 1992.  After a thorough investigation prompted by the discovery of the Omega transaction, petitioner understandably concluded that Günther's financial condition was so dire that petitioner had no option but to minimize its losses and dispose of Günther as soon as possible.  Petitioner considered several alternatives in making its decision, ultimately opting for a course of action that was designed to avoid Günther's bankruptcy under German law and any default by Günther on its bank loans.  Petitioner concluded that a bankruptcy proceeding and/or a default on Günther's bank loans could result in the assertion of a variety of contingent and potential liabilities and generate an even greater financial loss attributable to its investment in Günther than that projected from Günther's orderly disposal.

Both of petitioner's experts opined that Günther was finished as a going concern and that its stock was worthless as of May 31, 1992.  Respondent offered no expert testimony to refute their conclusions.  Moreover, although respondent argues that certain assets were not listed in Günther's FYE April 30, 1992, commercial report, he offered no evidence to rebut the testimony of petitioner's witnesses that the assets in question

had no value.  Given the overwhelming evidence of financial catastrophe introduced by petitioner, respondent would have been wise to offer some affirmative evidence to demonstrate Günther's potential value.  Respondent failed to do so.  The record presented to us supports a conclusion that a prudent businessperson would have considered Günther's stock to lack potential value because the company's liabilities substantially exceeded the fair market value of its assets, calculated on a conservative basis, and Günther's business was in such a state that Günther's assets could not reasonably be expected to exceed its liabilities in the future.

Our conclusion is consistent with that of the marketplace, which confirmed that Günther's stock was worthless.  After hiring consultants and spending months seeking a purchaser, petitioner could not find a company willing to acquire Günther on acceptable terms, even though it essentially was willing to give Günther away.  Before the offer from GAI, the only offer that petitioner received as a result of its efforts to dispose of Günther after May 31, 1992, would have required petitioner to pay the acquiring company the equivalent of over $12 million and to provide guaranties and concessions worth millions.

When petitioner finally convinced GAI to acquire Günther, petitioner had to assume $3,709,460 in bank debt, release the right to reinstate the intercompany account receivable of $11,429,665 it previously had waived to shore up Günther's German

commercial report, and forgive the remaining intercompany receivable of $761,228. Respondent argues, nevertheless, that Günther's stock had value because petitioner received a promissory note of DM 5 million under which GAI promised to make installment payments for Günther's stock. We do not think that the receipt of a promissory note in April 1994 demonstrates that Günther's stock had value as of May 31, 1992. The amount of the bank loans petitioner assumed, combined with petitioner's additional advances to Günther during FYE 1993 and 1994, substantially exceeded the face value of the promissory note. The promissory note obligated GAI to pay petitioner DM 5,000,000 only after petitioner had reconfigured Günther's balance sheet by eliminating a substantial part of Günther's fixed and contingent liabilities as of the date of sale. If anything, the terms of the sale support our conclusion that Günther's stock was worthless as of May 31, 1992. Günther's continuing financial problems effectively forced petitioner to provide economic benefits worth millions to GAI to facilitate the sale.

In a nutshell, respondent's argument is that Günther was merely undergoing a downturn and that, with sufficient recapitalization, it would make a full recovery. In support of his argument, respondent notes that Günther has become marginally profitable in the hands of GAI in the years following petitioner's sale of the company. While this point appears to weigh against our conclusion that Günther lacked potential value,

it must be remembered that GAI acquired a very different company; on the date of its acquisition by GAI, Günther had been relieved of all liability for its outstanding bank loans and petitioner's advances.  While GAI was willing to acquire Günther, with the hope of restoring it to profitability, a loss is not any less definite and ascertained because, in a later year, someone is willing to take a chance on the losing venture at a nominal price.  Steadman v. Commissioner, 50 T.C. at 378; Pearsall v. Commissioner, 10 B.T.A. 467, 469 (1928).

Respondent argues that this is not a case like those cited by petitioner[32] in which we found a lack of potential value despite continued operation or the absence of bankruptcy or liquidation proceedings because, in those cases, "the companies were defunct as a result of various fundamental factors precluding all prospect of future worth."  According to respondent, no fundamental factor precluded Günther's prospects of future worth; Günther was simply the victim of gross mismanagement, and the financial consequences of that mismanagement could be reversed, and were reversed, with time.  Respondent contends that the facts of this case are more analogous to those in Wally Findlay Galleries Intl., Inc. v.

---

[32]De Loss v. Commissioner, 28 F.2d 803 (2d Cir. 1928), affg. 6 B.T.A. 784 (1927); Preston v. Commissioner, 7 B.T.A. 414 (1927); Remington Typewriter Co. v. Commissioner, 4 B.T.A. 880 (1926); Emhart Corp. v. Commissioner, T.C. Memo. 1998-162.

Commissioner, T.C. Memo. 1996-293, and Datamation Servs., Inc. v. Commissioner, T.C. Memo. 1976-252. We disagree.

In Wally Findlay Galleries Intl., Inc. v. Commissioner, supra, we concluded that the taxpayer's French subsidiary was insolvent by only $26,228 and that the taxpayer had failed to sustain its burden of proving that the subsidiary lacked potential value. In this case, Günther's insolvency, conservatively calculated, totaled several million dollars and was coupled with severe operational problems exacerbated by inept and perhaps dishonest management. In Datamation Servs., Inc. v. Commissioner, supra, we concluded that the Datamation subsidiary was barely insolvent and needed only minor capital financing in order to continue as a going concern.

The severity of Günther's financial problems was evident, not just to petitioner but to third parties who considered acquiring Günther after May 31, 1992. Günther's situation more closely resembled the dire financial situations described in cases cited by petitioner. E.g., Ainsley Corp. v. Commissioner, 332 F.2d 555 (9th Cir. 1964), revg. T.C. Memo. 1963-183; De Loss v. Commissioner, 28 F.2d 803 (2d Cir. 1928), affg. 6 B.T.A. 784 (1927); Steadman v. Commissioner, 50 T.C. 369 (1968); Preston v. Commissioner, 7 B.T.A. 414 (1927); Emhart Corp. v. Commissioner, T.C. Memo. 1998-162; Harrington v. Commissioner, T.C. Memo. 1972-181; Richards v. Commissioner, T.C. Memo. 1959-64.

In connection with his argument that Günther had potential value as of May 31, 1992, respondent also raises a policy argument, arguing petitioner's position creates the possibility for abuse under section 165(g)(3).  According to respondent, a parent corporation that owns a subsidiary in need of recapitalization could delay providing funding, declare the stock worthless, and then recapitalize the company.  We reject respondent's argument because we do not see any abuse present in this case.  Petitioner faced a very real financial crisis in 1992, which threatened to undermine its own financial stability.  It was not playing games designed to obtain an improper tax advantage.

4.  Conclusion

Under the well-established standards applicable to a worthless stock loss, it is clear that a taxpayer need not be an "incorrigible optimist" with respect to his investment.  Steadman v. Commissioner, supra at 378 (quoting United States v. White Dental Manufacturing Co., 274 U.S. 398 (1927)).  We believe that a prudent businessperson would have concluded that Günther lacked both liquidation value and potential value in FYE May 31, 1992.  Petitioner has proven it incurred a worthless stock loss for FYE 1992 in an amount equal to the adjusted basis of its Günther stock as of May 31, 1992.  We hold that petitioner may deduct that loss on its consolidated tax return for FYE 1992, the year the stock became worthless.  See sec. 165(g)(1).

B.  Deduction Claimed on FYE May 31, 1993, Return

Petitioner also claimed a worthless stock deduction in the amount of $2,435,876 in FYE 1993.  This amount represents the basis created by the first waiver subject to reinstatement less the amount of the intercompany receivable that was deducted as a bad debt in FYE May 31, 1992.

In order to claim a worthless stock loss, the stock must become worthless during the taxable year.  See sec. 165(g)(1).  Thus, a taxpayer claiming a worthless stock loss must prove that the security had value anytime during the year, and that it became completely worthless during the year the deduction is claimed.  Steadman v. Commissioner, supra at 376.

On brief, petitioner conceded that the worthless stock loss it claimed on its FYE 1993 tax return is not deductible under section 165 but argued instead that the amount is deductible under section 166 as a bad debt.  We reject this argument.  As discussed previously, the amounts in question were capital contributions which cannot be deducted as bad debts under section 166.  Lidgerwood Manufacturing Co. v. Commissioner, 22 T.C. 1152 (1954), affd. 229 F.2d 241 (2d Cir. 1956); Plante v. Commissioner, T.C. Memo. 1997-386, affd. 168 F.3d 1279 (11th Cir. 1999); W.A. Krueger Co. v. Commissioner, T.C. Memo. 1967-192.  Because the amounts in question do not qualify as bona fide debt and because petitioner conceded on brief that it is not entitled to deduct a worthless stock loss with respect to advances made on

Günther's behalf after May 31, 1992, we sustain respondent's determination regarding petitioner's FYE May 31, 1993, worthless stock deduction.

III.  Conclusion

Because petitioner's shares of Günther's stock became worthless during FYE May 31, 1992, petitioner is entitled to deduct a worthless stock loss of $13,938,562 for that year but is not entitled to any of the bad debt deductions claimed. Consistent with respondent's concession and this opinion, additional amounts charged to the intercompany account after May 31, 1992, excluding only the bank debt assumed during FYE 1994, shall be taken into account in computing petitioner's capital loss from the sale of Günther in FYE May 31, 1994.

We have considered all arguments for a result contrary to that expressed herein, and, to the extent not discussed above, we conclude that those arguments are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.